# EXHIBIT C

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| PETER BARBARA and JOHN DREW,<br><br>*Plaintiffs,*<br><br>v.<br><br>MCGRIFF INSURANCE SERVICES, INC.,<br><br>*Defendant.* | § § § § § § § § § § § § § CIVIL ACTION NO.: 4:22-CV-03340 |

### DEFENDANT'S PROPOSED FINDINGS OF FACT

Defendant hereby submits the following Proposed Findings of Fact:

### FINDINGS OF FACT

1. Defendant McGriff Insurance Services, LLC ("McGriff") is a retail commercial insurance brokerage company that serves as intermediary between companies seeking insurance coverage and the underwriters who insure those risks.

2. McGriff employs brokers or "Producers" who interface between the client/insureds and the insurer carriers to help determine which underwriters provide the best coverage or the best price, or both for their clients.

3. In February 2002, McGriff began to heavily recruit Drew to join the company as a Producer or broker.

4. Over the next six months, Drew continued to negotiate with McGriff, each time receiving increasingly better offers to join McGriff.

5. By August 2002, Drew and McGriff reached a final agreement in which McGriff agreed to and paid Drew a rich compensation package, consisting of a large base salary, bonuses

based upon his individual and company performances, stock options, and other employment and retirement benefits, and an employment agreement. Based upon these terms, Drew agreed to join McGriff.

6. Drew was then 60 years old.

7. Drew is currently 81 years old, and still employed by McGriff.

8. Drew currently lives in Florida and is still employed by McGriff, earning an annual salary of approximately $425,000.

9. In 2004, McGriff promoted Drew to head its Dallas office, supervising approximately 65 employees, including 12 to 14 other Producers.

10. Drew's duties in this role included hiring and retaining other Producers and setting their annual compensation, including administering McGriff's various Producer compensation plans..

11. In February 2008, McGriff announced and rolled out a new broker compensation program (referred to herein as the "Program") for its Producers.

12. The Program included several features, such as the issuance of restricted stock units, a one-time "out of park" bonuses based on McGriff's very successful 2007 fiscal year, accelerated vesting of benefits, and forgivable producer loans.

13. With respect to those forgivable loans, the memorandum announcing the Program described the loans as follows:

> **Forgivable Producer Loans** – This is a key component of the program . . .[.] We have over $21 million in available loan money. We made the first loans in December 2007 and the balance will be made available over the next few months. Each loan is forgivable over a 10-year period, which cannot be shortened. The size of the production book determines the eligibility for a producer loan. At $1 million, a producer is eligible for a $200,000 loan. At leach increase of $500K in book size, the producer is eligible for an additional $100K loan. As an example, a producer with a $3.2 million book is eligible for a loan of up to $600K. When his book exceeds $3.5 million, he is eligible for an additional $100K loan.

14. The Program provides that was that "not every producer eligible for a loan will receive a loan."

15. As Drew acknowledged and correctly described it, McGriff used the forgivable loan aspect of the Program it for both recruiting internal and potential external candidates and to retain internal Producers.

16. In a July 23, 2008 memo that Drew authored and provided to an existing McGriff employee looking to transition into the role of a Producer, Drew detailed all of the compensation components including the "Producer Loan," which he described thusly: "Upon achieving $1,000,000 in cumulative new business production (and your production book is greater than $1,000,000 for a calendar year), you will be eligible to receive a forgivable producer loan of $200,000 that will be vested over a period of ten years at ten percent a year. Additionally, you may qualify for additional loans by increasing your production at $500,000 increments. (It should be understood that the program is not an entitlement and subject to management discretion.)"

17. Drew knew about the forgivable loan program when he sent this July 23, 2008 recruiting memo.

18. Two months later, Drew sent an offer letter to an external Producer candidate, in which he described the forgivable loan aspect of the Program using almost exactly the same language.

19. For those Producers selected to participate, McGriff made an up-front, lump-sum payment, with equal repayment amounts nominally due each year from the Producer over the course of the next ten years.

20. However, so long as the Producer did not voluntarily terminate his or her employment with McGriff and did not have their employment terminated for cause, McGriff forgave an equal amount of the loan, plus accrued interest, on each date payment would otherwise

have been due, such that the entire loan was forgiven on what would have been the tenth and final repayment date.

21. If a Producer, having already received an initial loan, hit a new threshold, he or she became eligible for an additional loan amount, as described above, and was required to sign a new promissory note with the same or comparable terms. However, if a Producer, having hit a certain threshold amount that made that Producer eligible for a forgivable loan did not meet the next threshold level, the Producer would not any additional loans, even if the Producer's "book of business remained constant.

22. In 2008, McGriff did not select Drew to receive a forgivable loan, although his book of business that year exceeded the $1 million threshold that could have led McGriff to issue a discretionary forgivable loan as described above.

23. McGriff explained to that it did not select him to participate in this aspect of the Program because he had a unique and unusually generous compensation plan, negotiated as a one-off at the time McGriff hired him in 2002, that was unlike what it made available to other Producers.

24. McGriff further relied on the fact that Drew received a unique compensation program whereby he received 100 percent credit for insurance products that he cross-sold with other producers, even where the other producer *also* received his or her ordinary split. In other words, for most producers, if more than one is working on an account the credits for that account are apportioned between them, such that the total adds up to 100%. But in Drew's case, he received and continued to receive 100% credit for each of these accounts, even when another Producer assists in servicing the account. No other McGriff Producer has this arrangement.

25. McGriff began applying the compensation program described immediately above in 2005, when other producers for the first time began to cross-sell insurance products to customers Drew brought with him to McGriff at the time of his hire in 2002.

26. McGriff continues to apply the compensation program described immediately above through the present day, and does so though a manual adjustment of the business otherwise reflected in McGriff's records (*i.e.*, where McGriff's records would otherwise reflect at 50% split to Drew on a piece of cross-sold business, McGriff employees manually adjust McGriff's records to show a 100% split to Drew in the circumstances described above).

27. As a result of the above-described compensation program , Drew has realized and been paid approximately $1.4 million more in salary than he would otherwise had received if McGriff allocated only a portion of the cross-sold business to his "book," as it does with other Producers, rather than 100% of the cross-sold business. No other Producer has this benefit or arrangement, and McGriff would never have offered Drew both a forgivable loan and agreed to pay him this additional salary of approximately $1.4 million dollars.

28. Drew first heard of the concept of Program in 2005 or 2006.

29. He attended a conference in May 2007 where the details of the Program were laid out.

30. Drew then learned of the Program officially in 2008 when McGriff's senior management rolled it out.

31. In 2008, Drew knew that (a) McGriff was making forgivable loans, (b) he could qualify to receive one based upon the size of his "book" of business, and (c) McGriff had not selected him to receive a forgivable producer loan. Drew did not file a charge of discrimination about McGriff's decision not to make him a forgivable loan until 2021.

32. Specifically, Drew's "book of business" in 2007 – used to determine whether he qualified for a forgivable loan in 2008 – was in excess of $2.5 million but less than $3 million.

33. Between 2008 and 2015, Drew repeatedly complained to his superiors, including Tom Lambert (McGriff's then-CFO), Bruce Dunbar (McGriff's then-CEO), Tommy Ebner (McGriff's then-President for the Texas Region) and Doug Hodo (who also served for a time as McGriff's President for the Texas Region) about the fact that McGriff had not selected him to participate in the forgivable loan program, discussing it with Tom Lambert (McGriff's then-CFO) in 2008.

34. No one at McGriff with whom Drew spoke from the time the Program was first discussed and for several years thereafter ever told Drew that his age had anything to do with McGriff's decision not to offer him a forgivable loan.

35. In 2016, following Drew's repeated years of inquiring and complaining, Drew received a $50,000 forgivable loan from McGriff, evidenced by a five-year promissory note, which he accepted without complaint.

36. As Drew remained employed by McGriff for five years thereafter (and remains currently employed by McGriff), Drew's obligation to repay that loan was extinguished in 2021.

37. Drew never again raised the Program or discussed it with anyone until 2021.

38. Drew has never received a forgivable loan under the Program.

39. Drew's "book of business," as calculated for the purpose of the forgivable loan portion of the Program, has never exceeded $3 million.

40. Under the terms of the forgivable loan under the Program, if Drew had received a $500,000 loan in 2008, based on his 2007 book of business, he would never been eligible to receive an additional loan.

41. Several producers have received multiple forgivable loans under the Program.

42. In each instance, the producer's second (and any subsequent) loans were the result of the producer achieving an additional threshold in "book value."

43. Drew filed his first and only Charge of Discrimination with the Equal Employment Opportunity Commission on September 14, 2021 (the "Charge").

44. Other than the Charge, Drew has never filed a charge of discrimination relating to the Program, or his exclusion from it, or regarding any other employment practice on the part of McGriff at any time during his employment.

45. Drew filed this lawsuit in state court on August 11, 2022, alleging that his exclusion from the program was discriminatory based upon his age, in violation of the ADEA and Chapter 21 of the Texas Labor Code.

46. Drew's allegations in the lawsuit that he was "kept in the dark" about the Program when it was implemented, and that he was "unaware of the program's details" and of McGriff's allegedly discriminatory decision to exclude him from it, and thus "dutifully toiled for the company for another ten+ years" are false.

Respectfully submitted,

By: /s/ *Gary D. Eisenstat*
    Gary D. Eisenstat
    Texas State Bar No. 06503200
    gary.eisenstat@ogletree.com
    John M. Barcus
    Texas State Bar No. 24036815
    john.barcus@ogletree.com
    **OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.**
    Preston Commons West
    8117 Preston Road, Suite 500
    Dallas, Texas 75225
    (214) 987-3800
    (214) 987-3927 (Facsimile)

**ATTORNEYS FOR DEFENDANT**

## CERTIFICATE OF SERVICE

I hereby certify that on December 27, 2023, the foregoing document was filed using the Court's electronic filing system, which will send notification of such filing to all counsel of record.

    /s/ *Gary D. Eisenstat*
    Gary D. Eisenstat

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| PETER BARBARA and JOHN DREW,<br><br>*Plaintiffs,*<br><br>v.<br><br>MCGRIFF INSURANCE SERVICES, INC.,<br><br>*Defendant.* | §§§§§§§§§§§§§ CIVIL ACTION NO.: 4:22-CV-03340 |

### DEFENDANT'S PROPOSED FINDINGS OF FACT

Defendant hereby submits the following Proposed Findings of Fact:

### FINDINGS OF FACT

1. Defendant McGriff Insurance Services, LLC ("McGriff") is a retail commercial insurance brokerage company that serves as intermediary between companies seeking insurance coverage and the underwriters who insure those risks.

2. McGriff employs brokers or "Producers" who interface between the client/insureds and the insurer carriers to help determine which underwriters provide the best coverage or the best price, or both for their clients.

3. In February 2002, McGriff began to heavily recruit Drew to join the company as a Producer or broker.

4. Over the next six months, Drew continued to negotiate with McGriff, each time receiving increasingly better offers to join McGriff.

5. By August 2002, Drew and McGriff reached a final agreement in which McGriff agreed to and paid Drew a rich compensation package, consisting of a large base salary, bonuses

based upon his individual and company performances, stock options, and other employment and retirement benefits, and an employment agreement. Based upon these terms, Drew agreed to join McGriff.

6. Drew was then 60 years old.

7. Drew is currently 81 years old, and still employed by McGriff.

8. Drew currently lives in Florida and is still employed by McGriff, earning an annual salary of approximately $425,000.

9. In 2004, McGriff promoted Drew to head its Dallas office, supervising approximately 65 employees, including 12 to 14 other Producers.

10. Drew's duties in this role included hiring and retaining other Producers and setting their annual compensation, including administering McGriff's various Producer compensation plans..

11. In February 2008, McGriff announced and rolled out a new broker compensation program (referred to herein as the "Program") for its Producers.

12. The Program included several features, such as the issuance of restricted stock units, a one-time "out of park" bonuses based on McGriff's very successful 2007 fiscal year, accelerated vesting of benefits, and forgivable producer loans.

13. With respect to those forgivable loans, the memorandum announcing the Program described the loans as follows:

> **Forgivable Producer Loans** – This is a key component of the program . . .[.] We have over $21 million in available loan money. We made the first loans in December 2007 and the balance will be made available over the next few months. Each loan is forgivable over a 10-year period, which cannot be shortened. The size of the production book determines the eligibility for a producer loan. At $1 million, a producer is eligible for a $200,000 loan. At leach increase of $500K in book size, the producer is eligible for an additional $100K loan. As an example, a producer with a $3.2 million book is eligible for a loan of up to $600K. When his book exceeds $3.5 million, he is eligible for an additional $100K loan.

14. The Program provides that was that "not every producer eligible for a loan will receive a loan."

15. As Drew acknowledged and correctly described it, McGriff used the forgivable loan aspect of the Program it for both recruiting internal and potential external candidates and to retain internal Producers.

16. In a July 23, 2008 memo that Drew authored and provided to an existing McGriff employee looking to transition into the role of a Producer, Drew detailed all of the compensation components including the "Producer Loan," which he described thusly: "Upon achieving $1,000,000 in cumulative new business production (and your production book is greater than $1,000,000 for a calendar year), you will be eligible to receive a forgivable producer loan of $200,000 that will be vested over a period of ten years at ten percent a year. Additionally, you may qualify for additional loans by increasing your production at $500,000 increments. (It should be understood that the program is not an entitlement and subject to management discretion.)"

17. Drew knew about the forgivable loan program when he sent this July 23, 2008 recruiting memo.

18. Two months later, Drew sent an offer letter to an external Producer candidate, in which he described the forgivable loan aspect of the Program using almost exactly the same language.

19. For those Producers selected to participate, McGriff made an up-front, lump-sum payment, with equal repayment amounts nominally due each year from the Producer over the course of the next ten years.

20. However, so long as the Producer did not voluntarily terminate his or her employment with McGriff and did not have their employment terminated for cause, McGriff forgave an equal amount of the loan, plus accrued interest, on each date payment would otherwise

have been due, such that the entire loan was forgiven on what would have been the tenth and final repayment date.

21. If a Producer, having already received an initial loan, hit a new threshold, he or she became eligible for an additional loan amount, as described above, and was required to sign a new promissory note with the same or comparable terms. However, if a Producer, having hit a certain threshold amount that made that Producer eligible for a forgivable loan did not meet the next threshold level, the Producer would not any additional loans, even if the Producer's "book of business remained constant.

22. In 2008, McGriff did not select Drew to receive a forgivable loan, although his book of business that year exceeded the $1 million threshold that could have led McGriff to issue a discretionary forgivable loan as described above.

23. McGriff explained to that it did not select him to participate in this aspect of the Program because he had a unique and unusually generous compensation plan, negotiated as a one-off at the time McGriff hired him in 2002, that was unlike what it made available to other Producers.

24. McGriff further relied on the fact that Drew received a unique compensation program whereby he received 100 percent credit for insurance products that he cross-sold with other producers, even where the other producer *also* received his or her ordinary split. In other words, for most producers, if more than one is working on an account the credits for that account are apportioned between them, such that the total adds up to 100%. But in Drew's case, he received and continued to receive 100% credit for each of these accounts, even when another Producer assists in servicing the account. No other McGriff Producer has this arrangement.

25. McGriff began applying the compensation program described immediately above in 2005, when other producers for the first time began to cross-sell insurance products to customers Drew brought with him to McGriff at the time of his hire in 2002.

26. McGriff continues to apply the compensation program described immediately above through the present day, and does so though a manual adjustment of the business otherwise reflected in McGriff's records (*i.e.*, where McGriff's records would otherwise reflect at 50% split to Drew on a piece of cross-sold business, McGriff employees manually adjust McGriff's records to show a 100% split to Drew in the circumstances described above).

27. As a result of the above-described compensation program, Drew has realized and been paid approximately $1.4 million more in salary than he would otherwise had received if McGriff allocated only a portion of the cross-sold business to his "book," as it does with other Producers, rather than 100% of the cross-sold business. No other Producer has this benefit or arrangement, and McGriff would never have offered Drew both a forgivable loan and agreed to pay him this additional salary of approximately $1.4 million dollars.

28. Drew first heard of the concept of Program in 2005 or 2006.

29. He attended a conference in May 2007 where the details of the Program were laid out.

30. Drew then learned of the Program officially in 2008 when McGriff's senior management rolled it out.

31. In 2008, Drew knew that (a) McGriff was making forgivable loans, (b) he could qualify to receive one based upon the size of his "book" of business, and (c) McGriff had not selected him to receive a forgivable producer loan. Drew did not file a charge of discrimination about McGriff's decision not to make him a forgivable loan until 2021.

32. Specifically, Drew's "book of business" in 2007 – used to determine whether he qualified for a forgivable loan in 2008 – was in excess of $2.5 million but less than $3 million.

33. Between 2008 and 2015, Drew repeatedly complained to his superiors, including Tom Lambert (McGriff's then-CFO), Bruce Dunbar (McGriff's then-CEO), Tommy Ebner (McGriff's then-President for the Texas Region) and Doug Hodo (who also served for a time as McGriff's President for the Texas Region) about the fact that McGriff had not selected him to participate in the forgivable loan program, discussing it with Tom Lambert (McGriff's then-CFO) in 2008.

34. No one at McGriff with whom Drew spoke from the time the Program was first discussed and for several years thereafter ever told Drew that his age had anything to do with McGriff's decision not to offer him a forgivable loan.

35. In 2016, following Drew's repeated years of inquiring and complaining, Drew received a $50,000 forgivable loan from McGriff, evidenced by a five-year promissory note, which he accepted without complaint.

36. As Drew remained employed by McGriff for five years thereafter (and remains currently employed by McGriff), Drew's obligation to repay that loan was extinguished in 2021.

37. Drew never again raised the Program or discussed it with anyone until 2021.

38. Drew has never received a forgivable loan under the Program.

39. Drew's "book of business," as calculated for the purpose of the forgivable loan portion of the Program, has never exceeded $3 million.

40. Under the terms of the forgivable loan under the Program, if Drew had received a $500,000 loan in 2008, based on his 2007 book of business, he would never been eligible to receive an additional loan.

41. Several producers have received multiple forgivable loans under the Program.

42. In each instance, the producer's second (and any subsequent) loans were the result of the producer achieving an additional threshold in "book value."

43. Drew filed his first and only Charge of Discrimination with the Equal Employment Opportunity Commission on September 14, 2021 (the "Charge").

44. Other than the Charge, Drew has never filed a charge of discrimination relating to the Program, or his exclusion from it, or regarding any other employment practice on the part of McGriff at any time during his employment.

45. Drew filed this lawsuit in state court on August 11, 2022, alleging that his exclusion from the program was discriminatory based upon his age, in violation of the ADEA and Chapter 21 of the Texas Labor Code.

46. Drew's allegations in the lawsuit that he was "kept in the dark" about the Program when it was implemented, and that he was "unaware of the program's details" and of McGriff's allegedly discriminatory decision to exclude him from it, and thus "dutifully toiled for the company for another ten+ years" are false.

Respectfully submitted,

By: /s/ *Gary D. Eisenstat*
   Gary D. Eisenstat
   Texas State Bar No. 06503200
   gary.eisenstat@ogletree.com
   John M. Barcus
   Texas State Bar No. 24036815
   john.barcus@ogletree.com
   **OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.**
   Preston Commons West
   8117 Preston Road, Suite 500
   Dallas, Texas  75225
   (214) 987-3800
   (214) 987-3927 (Facsimile)

   **ATTORNEYS FOR DEFENDANT**

## CERTIFICATE OF SERVICE

I hereby certify that on December 27, 2023, the foregoing document was filed using the Court's electronic filing system, which will send notification of such filing to all counsel of record.

   /s/ *Gary D. Eisenstat*
   Gary D. Eisenstat