IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| **PETER BARBARA and JOHN DREW,** | § | |
| | § | |
| *Plaintiffs,* | § | |
| | § | |
| **v.** | § | |
| | § | **CIVIL ACTION NO. 4:22-CV-03340** |
| **MCGRIFF INSURANCE SERVICES, INC.,** | § | |
| | § | |
| | § | |
| *Defendant.* | § | |

## PLAINTIFF JOHN DREW'S PROPOSED PRETRIAL ORDER

Plaintiff John Drew files this Proposed Pretrial Order and respectfully shows the Court the following:

### INTRODUCTORY STATEMENT

On December 27, 2023, counsel for the parties conferred about various aspects of the Pretrial Order; however, counsel for Plaintiff was out of the state on vacation with family and was unable to complete Plaintiff's portions of the Order. Therefore, counsel agreed to confer again on December 28, 2023, to discuss stipulated facts and agreed proposals. As a result of that conference, Plaintiff submits this Proposed Pretrial Order, which includes all agreed assertions of fact and law to date, Plaintiff's issues of fact and law, and the other portions of Defendant's Proposed Pretrial Order filed on December 27, 2023 [Doc. 33].

1. **Appearance of Counsel**

   **PLAINTIFF**

   **GRAY REED & MCGRAW LLP**
   Jay Aldis
   State Bar No. 00785656
   jaldis@grayreed.com
   1300 Post Oak Boulevard, Suite 2000

1

Houston, Texas 77056
Telephone: (713) 986-7175
Facsimile: (713) 986-7100

**DEFENDANT**

**Ogletree, Deakins, Nash, Smoak & Stewart, P.C.**
Gary D. Eisenstat
State Bar No. 06503200
gary.eisenstat@ogletree.com
John M. Barcus
State Bar No. 24036185
john.barcus@ogletree.com
Preston Commons West
8117 Preston Road, Suite 500
Dallas, Texas 75225
Telephone: (214) 987-3800
Facsimile: (214) 987-3927

2.    **Statement of the Case**

**PLAINTIFF**

This is an age discrimination lawsuit pertaining to a Loan Bonus Program that 81-year-old Plaintiff John Drew ("Drew") has been excluded from for more than fifteen years. Because Mr. Drew's exclusion from the Program has been because of his age, he filed this lawsuit against Defendant McGriff Insurance Services, Inc. ("McGriff") pursuant to both the Age Discrimination in Employment Act of 1967 (the "ADEA") and the Texas Labor Code.

**DEFENDANT**

In this employment dispute, Plaintiff John Drew ("Drew") has sued McGriff Insurance Services, LLC ("McGriff") for age discrimination under both the Age Discrimination in Employment Act of 1967 ("ADEA") and the Texas Labor Code based upon its 2008 decision not to award Drew a discretionary forgivable loan as part of a producer compensation program that McGriff rolled out in 2008.

3.    **Jurisdiction**

The Court has jurisdiction over this lawsuit pursuant to 28 U.S.C. §§ 1331 and 1332, as well as 29 U.S.C. § 1367. The parties agree the Court has jurisdiction over this matter.

4.    **Motions Pending**

a.    Defendant's Motion for Leave to File Amended Answer [Doc. 13]

2

b.      Defendant's Motion for Summary Judgment [Doc. 29]

5.      **Contentions of the Parties**

**PLAINTIFF**

Mr. Drew has been cut out of the Loan Bonus Program because of his age.  McGriff's own corporate representative, Doug Hodo, who was designated to testify regarding any and all reasons for the exclusion of Mr. Drew from the Program, stated as follows:

Q.  Do you know of any reason other than age that Mr. Drew was not included in the

program?

A.  I do not.

Mr. Hodo went on to testify that (1) he and his supervisor Tommy Ebner – the CEO for McGriff Texas – both thought Drew should have been made part of the program, (2) he knows of no one better qualified than Drew to be in the program, (3) Drew is indisputably better qualified for inclusion based on his book of business than many others who are younger but have nevertheless been made part of the program, and (4) he knows of nothing that disqualifies Drew from participation. Instead, Mr. Hodo shared that when Mr. Ebner asked McGriff's Chairman and CEO Bruce Dunbar why Drew wasn't included, Mr. Dunbar responded that Drew was too old, and the program was designed to retain the younger producers.

McGriff nevertheless contends Mr. Drew's claims must be dismissed because they are untimely, despite the fact he tried for more than eight years to get to the bottom of why he was not included in the program and was met with a mix of lies and unresponsiveness and, ultimately, a token payment designed to ward him off and have him believe that was all he would ever receive.  But McGriff's shell game of responses to Drew's inquiries about his exclusion estops it from relying on limitations. In addition, equitable tolling and the Lilly Ledbetter Fair Pay Act of 2009 save Drew from any claims that his charge of discrimination was not timely.  Furthermore, unbeknownst to Mr. Drew until very recently, McGriff did not merely provide loans to Producers a single time.  Rather, it has issued loans every year since the advent of the program.  And Mr. Hodo testified he knows of nothing that would have precluded Drew from being eligible to participate in the program every year since 2008 up to, and including, 2023. Mr. Hodo also conceded that every time Drew hasn't been added to the program, there are people younger than him who have been, and every time that has happened Drew has made less money than those participants as a result.

Because Mr. Drew was plainly discriminated against because of his age, and that discrimination was willful on the part of McGriff, he is entitled to his lost wages, liquidated damages, and reasonable attorneys' fees.

4863-9768-8217.1

**DEFENDANT**

McGriff denies that it discriminated against Drew based upon his age (or otherwise) in violation of the ADEA or the Texas Labor Code when it declined to award him a discretionary forgivable loan as part of and under a compensation program that McGriff announced in February 2008.

Drew joined McGriff in 2002. He was then 60 years old. At the time of hire, Drew negotiated a very lucrative compensation package that far exceeded the normal amounts McGriff paid to other Producers. This was one of the reasons McGriff declined to award Drew a discretionary forgivable loan, and had nothing to do with his age.

Drew's annual salary was also far higher than similarly-situated Producers because typically, when more than one Producer services an account, McGriff allocates dollar credits for that work between or among the participating Producers, such that the percentage amounts of the allocation totals 100%. However, beginning in 2005—and continuing to this day—although other Producers work on accounts that Drew may have originated, he still receives full credit (*i.e.,* 100%) on each such account. Drew's salary is then calculated based upon this full (100%) allocation. As a result, from 2005 to the present, McGriff has paid Drew an additional $1.4 million in salary, above what his salary would have otherwise been without this 100% allocation. No other Producer has such an arrangement, and Drew would never have been eligible for and received *both* a forgivable loan, and this full credit resulting in his enhanced salary. The amounts Drew would have received if he had received only a forgivable loan would have been far less than the $1.4 million that McGriff has paid to Drew from 2005 to present. Drew's special compensation arrangement regarding co-sold/managed accounts, which had been in place for several years as of 2008, was an additional reason McGriff declined to also award Drew a discretionary forgivable loan based upon the size of his book of business, and was unrelated to his age.

McGriff announced the discretionary forgivable loan program in 2008, as part of a larger enhanced compensation program. Drew was clearly aware of this larger program, specifically including the forgivable loan program in 2008, as he used it to recruit and retain other Producers when he headed McGriff's Dallas office. Drew also knew *in* 2008 that he had not been selected to receive a forgivable loan, and had complained about that fact to his superiors starting in 2008 and each year after for the next several years. Drew also obviously knew his own age. And yet, Drew waited and did not file a charge of discrimination until 2021, some fifteen years later. Drew's charge and suit are therefore both untimely and his claims are barred as a result for this additional reason.

Finally, the Ledbetter amendment to the ADEA does not save Drew's age discrimination claims from being untimely. At most, even if Drew's charge were timely filed based on the Ledbetter amendment, he suffered no actionable *damages* during the charge-filing period, *i.e.*, 180 days prior to the date he filed the charge, because all of his damages accrued, if at all, in 2008. The Texas Labor Code does not incorporate the Ledbetter amendment to the ADEA, whether expressly or by incorporation, and his state law claims are not "saved" from being untimely.

6.    **Admissions of Fact**

a.   Drew joined McGriff in 2002 as a Producer.

b.   Drew was 60 years old at the time.

c.   For seven years, Drew headed McGriff's Dallas office.

d.   In 2008, McGriff formally announced a new compensation program for Producers.

e.   The compensation Program included a discretionary forgivable loan component under which, if a Producer's "Book" of business reached a minimum amount of $1,000,000, the Producer was eligible to receive a discretionary forgivable loan of $200,000.

f.   The forgivable loan component of the Program was discretionary, and neither Drew nor any other Producer had an entitlement to a loan simply by virtue of the size of the Producer's "Book."

g.   McGriff did not select Drew to participate in the forgivable loan program when it was announced in 2008, and each year thereafter.

h.   In 2016, McGriff made Drew a $50,000 forgivable loan, repayable over five years, which amount was forgiven by 2021.

i.   Aside from the $50,000 forgivable loan Drew received in 2016, he has not otherwise received any forgivable loans, including under the Program.

j.   Drew is currently employed by McGriff as a producer.

k.   Drew's current annual salary is approximately $425,000.

l.   No McGriff employee made any age animus statements or remarks to Drew about his age.

m.   Drew jointly filed his only charge of discrimination with the EEOC and Texas Workforce Commission on September 14, 2021, regarding his non-participation in the forgivable loan program.

7.    **Contested Issues of Fact**

      **PLAINTIFF**

a.   John Drew is 81 years old.  He has been in the commercial insurance business for five decades.

b.   In 2002, Drew was a Producer in Dallas for a company called Marsh.  At that time, he was approached by McGriff about coming to work for them. After several months of discussions and negotiations, Drew signed an offer letter and employment agreement and began working for McGriff on August 2, 2002.  Neither the offer letter nor employment agreement preclude Drew

from participating in any payment programs at McGriff. His title was Senior Vice President and he reported directly to Executive Vice President Doug Hodo, whose supervisor was Tommy Ebner, CEO of McGriff Texas. Mr. Ebner reported to McGriff's Chairman, Bruce Dunbar.

c.   In 2004, Drew became the head of the Dallas office. In that role, he supervised approximately eight Producers and a staff of 65 to 70 employees. He had the largest book of business in the Dallas office and the twelfth largest book in the entire company. By 2008, the book had grown to $2,764,332.15.

d.   Drew has never had any disciplinary issues or demonstrated any poor citizenship at McGriff. He and Peter Barbara (one of the two initial Plaintiffs in this lawsuit who has settled his claims with McGriff) were the two oldest Producers at the Company.

e.   On February 2, 2008, McGriff's Chairman, Bruce Dunbar, issued a Memorandum regarding "Producer Retention" to eight members of the Company's leadership team, including the heads of its offices in Atlanta, Birmingham and Houston. Notably, Drew was not a recipient of the memo -- even though he was the head of the Dallas Office -- and did not see it until this litigation. The memorandum stated at page one:

> As you are aware, we are ready to communicate our Producer Retention program to all producers. I am very pleased with the various incentives we have been able to include and the overall magnitude our producer compensation package. In order to clearly communicate the appropriate message to all parties, I wanted to summarize the key talking points of this package and a general discussion of the tools we have available.

f.   The document then identified <u>five</u> retention compensation programs – Annual Earn-Out Bonus, Out of Park Bonus, Restricted Stock Grants, Forgivable Producer Loans and Book Equity. As to Forgivable Producer Loans, page two of the memorandum said:

> This is a key component of the program ... . We have over $21 million in available loan money. We made the first loans in December 2007 and the balance will be made available over the next few months. Each loan is forgivable over a 10-year period. Which cannot be shortened.[1] The size of the production book determines the eligibility for a producer loan. At $1 million, a producer is eligible for a $200,000 loan. At each increase of $500,00 in book size, the producer is eligible for an additional $100K loan. As an example, a producer with a $3.2 million book is eligible for a loan of up to $600K. When his book exceeds $3.5 million, he is eligible for an additional $100K loan.

g.   Two months later, on April 24, 2008, Mr. Dunbar sent a letter to Drew. The first paragraph stated:

---

[1]   Despite the reference to the ten-year period not being shortened, it actually has been in several instances. Due to competitors offering shorter periods, and changes in tax laws, the period has been reduced to as little as four years.

> We appreciate and value your contribution to McGriff, Seibels & Williams, Inc. Accordingly, we have prepared this outline of traditional and retention compensation along with the attached exhibit to communicate and illustrate the various types and amounts of rewards, which the company makes available to you.

h. The letter then falsely stated that McGriff's "retention compensation" was composed of only <u>four</u> cash compensation and stock grants and options: Earn Out Bonus, Out of Park Bonus, Restricted Stock and Book Equity. Remarkably, the letter made no mention of the Forgivable Producer Loans which are the subject of this lawsuit.

i. Later in 2008, Drew became aware of the existence of the Forgivable Producer Loan Program (the "Program"). Drew only knew a Program existed but did not know how it operated. He called McGriff's CFO, Tom Lambert, and asked why he hadn't been included. Lambert falsely assured Drew that his participation "would come along later." It didn't, so Drew continued, over and over again, to inquire about his exclusion.

j. In 2009, at a conference at the Marriott hotel in Point Clear, Alabama, Drew pulled Bruce Dunbar aside and asked him why he hadn't received anything from the Program. Similar to Lambert, Dunbar provided a false front and told Drew he had a better deal because Drew was going to receive Book Equity for five years once he retired. But that was not true, as Book Equity was apparently provided to all producers, including several who were put in the Program.

k. When another year or two passed and nothing happened, Drew talked with Tommy Ebner about being included in the Program. When that went nowhere, Drew tried getting some relief from Doug Hodo. Hodo was sympathetic and told Drew, "it wasn't right," because he should be in the Program. He assured Drew he would do what he could about the situation. But the half-dozen or so conversations Drew had with Hodo over the course of the next four to five years still didn't move the needle. Mr. Hodo's response each time they spoke was that he simply couldn't get anything done.

l. So, Drew reached out to Mr. Ebner again in 2012 and they met in the Dallas office. Mr. Ebner said he would look into things. Again, Drew heard nothing, so he called Mr. Ebner later that year but received no response to his phone message. In 2015, Drew actually flew down to Houston to see Mr. Ebner about the Program. Mr. Ebner told Drew that his participation in the Program was something he and Mr. Dunbar had actually talked about a lot but Drew's inclusion in Book Equity, rather than inclusion in the Program was what "we think is best for you. But that, too, was false, because Book Equity participation and Program participation were clearly not mutually exclusive.

m. During the time period of 2012-2015, Mr. Hodo asked Mr. Ebner to go directly to Mr. Dunbar (who actually made all the decisions of who was included in the Program) and ask why Drew had been excluded. Ebner did so, and Dunbar's response was, "Drew and [former Plaintiff] Pete Barbara didn't get in because they were too old, and this was a retention program to keep the young producers." Despite knowing of these comments by Dunbar and believing Drew was

treated unfairly with respect to the Program, Mr. Hodo never reported them to Drew and Drew only learned of them during this litigation. When asked why he didn't tell Drew or Barbara what Mr. Dunbar had said, Mr. Hodo responded, "Not sure." When asked if he was fearful he would be retaliated against by Mr. Dunbar, Mr. Hodo responded, "Not sure."

n. Nevertheless, Mr. Drew's 2015 meeting with Mr. Ebner apparently did finally spur him into action. On December 18, 2015, Mr. Ebner sent an e-mail to CFO Tom Lambert with a subject line of "john Drew." The e-mail stated:

> John is following up on the meeting we (he and I) had in the summer about not getting a loan like the others, still in the game supporting company, having great years in new etc. You and I discussed about what we might be able to do as a one off and deferred discussion etc. John has followed up today and I just told him it was "on the list." Please put this on your Christmas/year end list as well. Thanks.

o. Five days later, Lambert responded by e-mail, apparently admitting Drew should have been made part of the program all along. The e-mail said:

> [w]e can give him some cash from the Great Performers bonus pool (say 25% to 50% of the amount of any loans he missed) in 2016 or we can give him a loan during the next cycle. Perhaps we can do for him what we did for Bob Verdin … 50% of the qualifying loan amount to be forgiven over 5 years or 1/3 of the qualifying loan amount to be forgiven over 3 years.

p. Out of the blue, on April 18, 2016, Lambert sent Drew an e-mail regarding his participation in the Program. It stated, "Congratulations on being selected to receive a producer retention loan! I have attached the loan document for your review and execution." The e-mail was accompanied by a Promissory Note in which Drew was provided a loan of only $50,000, which would be paid in five $10,000 annual installments through May 1, 2021, and was forgivable if he did not voluntarily terminate his employment or his employment was not terminated by McGriff for "Cause" during those five years.

q. Doug Hodo, who had been pushing for Drew's full participation in the Program, was disappointed by the meager payment of $50,000, particularly given Drew's production and all his contributions to McGriff. He contacted Drew and told him he was "embarrassed" the Company paid him only $50,000. Mr. Hodo added that he was "sorry," he had tried his best, $50,000 was all Drew was ever going to get out of the Program, and at least $50,000 was "better than nothing." When asked in his deposition if he believed Drew was paid the $50,000 in 2016 in order to keep him quiet and not have to deal with him anymore, Hodo responded, "Not sure."

r. Faced with the certainty there was nothing else he could do, the die had been cast on his Program participation, and $50,000 was all he was ever going to get, Drew ceased any further efforts to be included in the Program. From that point on, it wasn't until this litigation that McGriff provided him any visibility into whether any other Producers were receiving anything from the Program.

s.  On September 14, 2021, former Plaintiff Peter and Barbara and Drew dual-filed their Charges of Discrimination with the Equal Employment Opportunity Commission and Texas Workforce Commission – Civil Rights Division.  In response to the Charges, McGriff submitted two Position Statements in or about September 2021.  The Statements were very telling.  Most notably, they did not deny Dunbar said he chose to exclude Barbara and Drew because they were "too old," and the Program was meant for retention of "the young guys."  Respondent's Position Statement simply ignored the fact those statements were made.  Moreover, the Position Statements provided a host of explanations for Barbara and Drew's exclusion that were completely at odds with explanations McGriff had previously submitted.  For instance, Ulmer had told Barbara the Program was created to "attract employees to join our organization" and added that "[w]hen new compensation vehicles are put in place for new employees, we can't renegotiate employment compensation with existing hires."  Yet, in the Position Statements, McGriff turned that explanation on its head, instead stating:

> McGriff's Producer Loan Program ("Program") was created in or about 2008. The Program was put in place to <u>retain</u> McGriff Producers with more than a [sic] one million dollars in their books of business.

t.  Thus, according to McGriff in April 2021, the Program was a recruitment vehicle; however, as of September 2021, their story had become that it was a retention tool.  McGriff has contradicted its reason on numerous occasions.  Those reasons are all false and pretext for age discrimination.

u.  McGriff contends, apparently based on Drew's initial Interrogatory Responses, that he is seeking damages only for being excluded from the Program in 2008.  However, those responses were based on Drew's belief at that time that a person could receive only one Forgivable Producer Loan.  However, since that time, he has learned -- as the record indisputably shows -- that McGriff provided many people multiple Forgivable Producer Loans.  Particularly given the testimony of Doug Hodo that he knows of nothing that precluded Drew from being eligible to participate in the Program as recently as 2023, he now realizes his previous Interrogatory Responses were incorrect and has supplemented those responses.

v.  Doug Hodo testified that the Program did not require an increase to the next threshold to receive another loan under the Program.  Mr. Hodo also testified he knows of nothing that would have precluded Drew from being eligible to participate in the Program in every year in which loans have been issued, including 2008, 2009, 2014, 2016, 2018, 2019, 2020, 2021 and 2023.  McGriff produced hundreds of Promissory Notes in discovery related to participation in the Program.  Of the 117 participants identified in the Promissory Notes, 80 received numerous loans under the Program.  And of the 37 who did not, eight only joined the Program in 2023, so they haven't yet had the opportunity to be granted multiple loans.

w.  Additionally, a chart produced by McGriff shows that an increase in book of business is not required for an additional loan.  For example, the chart shows that Marc Boots' book of business in 2008 only grew by $263,334, but he was still listed as eligible for a $400,000 loan under the Program.

x.   Further, even assuming McGriff's argument that Drew's eligibility to receive a loan after 2008 without hitting a new threshold "depends entirely on whether he received [a loan] in 2008 or not" is true, the evidence shows Drew would not have had to amass $500,000 more in business to remain eligible for the loan.  The chart demonstrates that Marc Boots (as well as numerous other Program participants), without increasing his book of business by $500,000, was eligible for an additional loan amount of $100,000. This contradicts McGriff's proposition that "a loan of $100,000 can *only* have been an incremental loan for hitting a new threshold." Therefore, based on McGriff's own argument, Drew remained eligible for the entire $500,000 loan he was entitled to in 2008 every year he was passed up, resulting in the type of repeated discriminatory compensation decisions which are prohibited by Lilly Ledbetter Act.  *See Niwayama v. Tex. Tech Univ.*, 590 Fed. Appx. 351, 356 (5th Cir. 2014) ("discrimination in compensation" means "paying different wages or providing different benefits to similarly situated employees . . . .").

y.   Even assuming the Program did require an increase in book of business, Drew was eligible for a loan throughout 2013-2022.  His book of business ranged from $1.46 million in 2013 to $3.025 million in 2020.  Therefore, he would have been eligible for a loan pursuant to the Program in 2021, which would place his Charge within 180 days of McGriff's discriminatory compensation.

z.   Furthermore, even if it were assumed that Drew was not eligible for an additional loan in 2021, Drew was given a $50,000 loan that was to be paid in five $10,000 installments through May 1, 2021.  Those installments were approximately 1/10th of what he should have received, and other younger Producers did receive, pursuant to the Program formula.  Therefore, even if Drew was not eligible to receive a loan without an increase in his book of business (he was) or he did not have an increase in his book of business making him eligible (he did), Drew was subjected to age discrimination through at least May 2021 by way of this $50,000 loan, which is within 180 days of September 2021, when he filed his EEOC/TWC Charge of Discrimination.

aa.  To this day, Drew remains employed by McGriff as an Executive Vice President and Producer.

bb.  Any propositions of law identified by Plaintiff that the Court concludes are more accurately considered propositions of fact.

**DEFENDANT**

a.   Whether Drew can prove by a preponderance of the evidence that, but for his age, McGriff would have selected Drew to participate in the forgivable loan program.

b.   Whether Drew can prove by a preponderance of the evidence that his age was a motivating factor in McGriff's decision regarding whether to select him to participate in the forgivable loan program.

c.   Whether Drew received compensation from McGriff above and beyond what it paid and pays to other Producers.

d.   Whether McGriff's decision not to award Drew a forgivable loan under the Program was based on the compensation package Drew negotiated at the outset of his employment in 2002.

4863-9768-8217.1

e.   Whether McGriff's decision not to award Drew a forgivable loan under the Program was based on the unique compensation structure implemented in 2005 whereby he continued to receive 100% credit for new business on certain accounts despite the fact that other Producers (a) had begun working on those accounts and (b) despite Drew's 100% credit, each still received the credit they would have received in the ordinary course.

f.   Whether Drew was aware of the forgivable loan program in 2008.

g.   Whether in 2008, Drew was also aware of that McGriff had not selected him to receive a forgivable loan in 2008.

h.   Whether between 2008 and 2015, Drew complained regularly that he had not been selected to receive a forgivable loan.

i.   Whether Drew would have been eligible to receive a forgivable loan after 2008, based upon the size of his annual book of business.

j.   Whether Drew would have been eligible to receive a forgivable loan based upon the size of his book of business in addition to the other amounts that McGriff paid Drew, such as his enhanced annual salary.

k.   If Drew were eligible to receive a forgivable loan in 2008, whether he would have ever been eligible to receive any other forgivable loan amounts within 180 days of September 14, 2021.

l.   Whether Drew can identify any comparators who were treated more favorably, *i.e.* whether he can show that McGriff has paid another Producer the amounts that it paid to Drew in enhanced salary *and* given them forgivable loans under the Program.

m.   If Drew is able to prove that he is entitled to a forgivable loan, what would the loan amount be, if any, and loan terms be?

n.   Whether Drew timely filed a charge of discrimination.

o.   If his charge of discrimination was timely filed, whether Drew suffered any actionable damages during the period of time for filing the charge (*i.e.*, 180 days prior to filing).

p.   Whether Drew's claims are barred by his failure to timely exhaust his administrative remedies.

q.   Whether Drew's claims are barred by the applicable statute(s) of limitations.

r.   Whether Drew's claims are barred by the doctrines of laches, unclean hands, after- acquired evidence, waiver, and/or estoppel.

s.   Whether a Producer's book of business had to grow by another $500,000 for the Producer to be eligible of an additional forgivable loan of $100,000.

t.   Whether Drew's book of business, as calculated for the purpose of forgivable producer loans, ever exceeded $3 million.

11

u.  Whether a McGriff employee made any statements or remarks to Drew that he was not selected to participate in the forgivable loan program because of his age.

To the extent any of the above are deemed to be contested issues of law, they are incorporated by reference as such.

8. **Agreed Propositions of Law**

a.  The Age Discrimination in Employment Act ("ADEA") makes it unlawful for an employer to "fail or refuse to hire or discharge any individual with respect to his compensation, terms, conditions, or privileges of employment." 29 U.S.C. § 623(a).

b.  A plaintiff proceeding under the ADEA must prove that he was "within the protected class," i.e., age 40 or older; qualified for the position he held; suffered an adverse employment decision; and was treated less favorably than similarly situated younger employees." *Leal v. McHugh*, 731 F.3d 405, 410-411 (5th Cir. 2015).

c.  To prevail on a cause of action for violation of 29 U.S.C. § 623(a)(1), "a plaintiff must prove that age was the 'but-for' cause of the employer's adverse action." *Harris v. City of Schertz*, 27 F.4th 1120, 1123 (5th Cir. 2022) (quoting *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 176 (2009)).

d.  Attorneys' fees under the ADEA are only available to a plaintiff who is a "prevailing party." *Tyler v. Union Co. of Cal.*, 304 F.3d 379, 404 (5th Cir. 2002).

e.  Under the Texas Labor Code (the "Code"), "an employer commits an unlawful employment practice if because of race, color, disability, religion, sex, national origin, or age the employer . . . discharges an individual, or discriminates in any other manner against an individual in connection with compensation or the terms, conditions, or privileges of employment." Tex. Lab. Code § 21.051.

f.  Under the Code, an "unlawful employment practice is established when the complainant demonstrates that race, color, sex, national origin, religion, age or disability was a motivating factor for an employment practice, even if other factors also motivated the practice[.]" Tex. Lab. Code § 21.125(a). "Motivating factor" means that the employee's age was "a reason for making the decision at the time it was made." *Dallas County Sheriff's Dep't v. Gilley*, 114 S.W.3d 689, 693 (Tex. App.—Dallas 2003, no pet.). *See also Price Waterhouse v. Hopkins*, 490 U.S. 228, 250 (1989) (in gender discrimination case, "in saying that gender played a *motivating part* in an employment decision, we mean that, if we asked the employer *at the moment of the decision what its reasons were* and if we received a truthful response, one of those reasons would be that the applicant or employee was a woman").

9.    **Contested Propositions of Law**

**PLAINTIFF**

a.    The Lilly Ledbetter Fair Pay Act amended the ADEA to read, in pertinent part:

> For purposes of this section, an unlawful practice occurs, with respect to discrimination in compensation in violation of this chapter, when a discriminatory compensation decision or other practice is adopted, when a person becomes subject to a discriminatory compensation decision or other practice, or when a person is affected by application of a discriminatory compensation decision or other practice, including each time wages, benefits, or other compensation is paid, resulting in whole or in part from such a decision or other practice.

> 29 U.S.C.A. § 626(d)(3).

b.    Therefore, each time a person is "affected by application of a discriminatory compensation decision or other practice" including when "wages, benefits, or other compensation is paid," the cause of action renews. *See id.*

c.    The Ledbetter Act does not apply to "discrete acts" such as "termination, failure to promote, denial of transfer, and refusal to hire." *Niwayama v. Tex. Tech Univ.*, 590 Fed. Appx. 351, 356 (5th Cir. 2014). Rather, the "discrimination in compensation" means "paying different wages or providing different benefits to similarly situated employees . . . ." *Id.* (quoting *Daniels v. United Parcel Serv., Inc.,* 701 F.3d 620, 630–31 (10th Cir. 2012)); *see also Noel v. Boeing Co.*, 622 F.3d 266, 275 (3d Cir. 2010) (distinguishing between a failure to receive a raise from failing to receive a promotion, which is a discrete act.).

d.    McGriff's decision to repeatedly exclude Drew from the Program from 2008 through the present day is precisely the kind of direct discrimination in compensation that is covered by the Ledbetter Act. This is not the case where a discrete act, like failure to promote, termination, or refusal to hire, led to lower pay. Rather, McGriff committed discrimination in compensation against Drew based upon his age by repeatedly refusing to provide him compensation under the Program but providing it to others who were younger but similarly situated (*i.e.* those eligible under the Program).

e.    McGriff's own corporate representative testified he did not know of anything that would have precluded Drew from participating in the Program in the same years as Marc Boots, who was a younger employee given a loan under the Program in 2008, 2009, 2014, 2016, 2018, 2019, 2020, 2021, and 2023. McGriff's corporate representative also testified he did not know of any reason why Drew was not included in the Program other than his age and agreed every time Drew was not made a part of the Program, other people younger than him were, which, of course, caused his compensation to be less than those younger participants. Thus, every time McGriff paid these other similarly situated but younger employees pursuant to the Program, but not Drew, Drew's discrimination claim renewed.

13

f.   The Promissory Note Drew signed in May 2016 for the loan he finally received indicated he would be paid in five $10,000.00 installments through May 1, 2021. These installments were approximately 1/10th of what he should have received, and other younger Producers did receive, pursuant to the Program formula. Therefore, Drew was subjected to age discrimination through at least May 2021, which is well within 180 days of September 2021, when he filed his EEOC/TWC Charge of Discrimination.

g.   There is no language in the ADEA, as amended by the Ledbetter Act, that limits the amount of damages that can be sought based upon a "look back" theory. *See generally* 29 U.S.C.A. § 626. Therefore, Drew is not limited to seeking back pay only in the 180 days preceding the filing of his charge. *See United States v. Clintwood Elkhorn Min. Co.*, 553 U.S. 1, 11 (2008) (There is a "strong presumption that the plain language of the statute expresses congressional intent . . . .") (internal quotations omitted); *Mehmen v. Collin Cnty., Tex.*, 558 F. Supp. 2d 711, 715 (E.D. Tex. 2007) ("The plain language of the statute must be the court's North Star."); *McMellon v. United States*, 387 F.3d 329, 339 (4th Cir. 2004) ("The Supreme Court has repeatedly explained that the plain language of a statute is the best evidence of Congressional intent.").

h.   Equitable tolling and/or equitable estoppel toll any limitations period until 2021.

i.   Federal law governs the pleading requirements of this case; therefore, Drew was only required to, and did, plead sufficient facts to put McGriff on notice of the reliance on tolling theories.

j.   When a case is removed to federal court, federal law governs procedural requirements, including pleading requirements. *Simpson v. James*, 903 F.2d 372, 375 (5th Cir. 1990); *Hudnall v. Tex.*, No. EP-22-CV-36-KC-RFC, 2022 WL 3219423, at *11 (W.D. Tex. Aug. 9, 2022) (noting that a federal court hearing state law claims under diversity or supplemental jurisdiction shall apply state substantive law and federal procedural law.). Therefore, the pleading requirements for both of Drew's claims for age discrimination under the ADEA and Chapter 21 of the Texas Labor Code are governed by federal law.

k.   Federal law mandates that a plaintiff need only plead sufficient facts to put the defense on notice of the reliance on a tolling theory. *Colonial Penn Ins. Co. v. Mkt. Planners Ins. Agency, Inc.*, 1 F.3d 374, 376 (5th Cir. 1993). For example, in *Ray v. Lynass*, the Western District of Texas recently held that the facts pleaded gave sufficient notice of the reliance on the discovery rule where the plaintiff alleged that the defendant made representations that he had the knowledge, skill, and experience to greatly expand plaintiff's business yet failed to do so when he was supposed to contact prospective customers but failed to convert any leads. No. 1:21-CV-0020-DH, 2023 WL 7238682, at *8 (W.D. Tex. Nov. 2, 2023). Similarly, the Fifth Circuit held sufficient facts were alleged to show reliance on the discovery rule and fraudulent concealment where the plaintiff's allegations included a statement that the defendant breached its duty as an agent as a fiduciary by "failing to disclose all material information with respect to the sale of [plaintiff's p]olicies and the premiums arising from those sales, and by failing to account for money received by [defendant] on behalf of plaintiff [.]" *Colonial Penn Ins. Co.*, 1 F.3d at 376, 378, n.2 (5th Cir. 1993).

14

l.  Drew alleged ample facts to put McGriff on notice of his reliance on equitable estoppel and equitable tolling.   Specifically, the Original Petition alleges that McGriff's provided explanations for its refusal to include the Plaintiffs in the Program were "false and, when called on those falsities, [McGriff] simply came up with more inaccurate justifications for the employees' wrongful exclusions from the program." *See Pet. at ¶ 6.*  Drew again provides notice of his reliance on a tolling theory in paragraph 19 by further detailing the erroneous justifications provided to him by McGriff for his exclusion in the program.  *See Pet. at ¶ 19.*  Drew also alleges he did not find out about McGriff's justifications being false until 2021, when he and Plaintiff Peter Barbara began discussing the Program and inquiring about their exclusion. *See Pet. at ¶¶ 13, 19.*  McGriff's corporate representative was asked if he knew of any inaccuracies in Paragraph 13 of the Petition.  He testified he did not.  Therefore, Drew provided sufficient evidence to put McGriff on notice of his reliance on equitable estoppel and equitable tolling.

m.  Even if Texas state law did apply, Texas does not require defenses to limitations, like the discovery rule and other tolling principles, to be pled until a defendant pleads the affirmative defense of limitations. *See Superior Air Parts, Inc. v. Kubler*, No. 3:14-CV-3492-D, 2015 WL 567223, at *11 (N.D. Tex. Feb. 11, 2015).  McGriff has not pled a defense of limitations in its Answer on file.  Therefore, if state law applies, Drew does not yet have to plead tolling principles.

n.  McGriff should be estopped from relying upon a limitations defense due to its continued concealment and misrepresentation of facts to lull Drew into failing to timely file a charge of discrimination.

o.  Filing of a timely charge of discrimination with the EEOC or TWC is not a jurisdictional prerequisite to suit. *See Hinkley v. Envoy Air, Inc.*, 968 F.3d 544, 553 (5th Cir. 2020) ("[W]e conclude § 21.202's 180-day filing deadline, although mandatory, is not jurisdictional."); *Granger v. Aaron's, Inc.*, 636 F.3d 708, 711 (5th Cir. 2011) ("[F]iling a timely charge of discrimination with the EEOC is not a jurisdictional prerequisite . . . .").  As such, like statute of limitations, filing a charge of discrimination is subject to waiver, estoppel, equitable tolling or the discovery rule. *Granger*, 636 F.3d at 711.

p.  Equitable estoppel prevents a defendant from asserting that a discrimination charge was untimely as a defense where the defendant concealed facts or misled the plaintiff thereby causing the plaintiff to not assert his rights within the limitations period.  *See Rhodes v. Guiberson Oil Tools Div.,* 927 F.2d 878-79 (5th Cir. 1991); *see also Pruet Prod. Co. v. Ayles*, 784 F.2d 1275, 1280 (5th Cir. 1986) ("An employer's misrepresentations or wrongful concealment of facts necessary to support a discrimination charge have given rise to estoppel where they prevented an employee from asserting his rights timely.").  "An essential element of equitable estoppel is that the party asserting must have reasonably relied on the statement or the conduct of the party sought to be estopped." *Tomlin v. Signal Intern.*, No. 1:11-CV-3, 2012 WL 3984517, at *5 (E.D. Tex. Aug. 9, 2012).

q.  In *Rhodes v. Guiberson Oil Tools Div.,* the 56-year-old plaintiff received notice he was being discharged from his job with defendant because of a reduction in work force on October 15, 1986. *Rhodes*, 927 F.2d at 877.  His last day on the job was October 31, 1986. *Id*.  On or about

December 19, 1986, the plaintiff discovered that four days earlier, defendant had hired a 42-year-old to replace him. *Id.* Plaintiff filed a charge with the EEOC on April 28, 1987, 195 days after he received notice of his termination. *Id.* The Fifth Circuit held that equitable estoppel applied as the plaintiff did not learn of his age discrimination claim until he found out he was replaced by a younger man as the defendant concealed facts and misled him by stating he was being terminated due to a reduction in work force. *Id.* at 880-82.

r.    Here, McGriff has similarly concealed and misstated facts to lull Drew into not approaching the EEOC or TWC sooner. When McGriff communicated the retention tools available to Drew, it left out any mention of the Program despite the Program being included in a memorandum regarding "Producer Retention" just two months earlier. *See Exhibits C and D.* When Drew tried, over and over again, to get to the bottom of why he had not been put in the Program, McGriff responded falsely. First, its CFO indicated participation "would come along later." It didn't, so Drew approached the Chairman/CEO and the President for McGriff Texas and was told by both of them that he was included in Book Equity, rather than the Program, and that was better for him. It wasn't, and the assertion couldn't have possibly been true, as many Producers participated in both Book Equity and the Program. McGriff's corporate representative, Mr. Hodo, also confirmed he himself, despite not knowing of any other reason why Drew was excluded from the Program other than age, and being told by the CEO of McGriff's Texas division that Drew was not included because of his age, never told Drew that he was not included in the Program due to his age prior to 2021. Additionally, when Drew was given $50,000.00 in 2016 -- a mere fraction of what he was entitled to under the Program but for his age -- he was told by Mr. Hodo that $50,000.00 is better than nothing and Drew understood he would never receive anything else. Only then did Drew cease to inquire about the program.

s.    McGriff's corporate representative testified he was not sure what else Drew could have done to act diligently to find out why he was excluded from the Program when the CEO had told him it was because he was getting Book Equity.

t.    The Promissory Note Drew signed related to the loan indicated he would be paid in five $10,000 installments through May 1, 2021. These installments were approximately 1/10[th] of what he should have received, and other younger Producers did receive, pursuant to the Program formula. Therefore, even if the Court chose not to toll limitations, Drew was subjected to age discrimination through at least May 2021, which is well within 180 days of September 2021, when he filed his EEOC/TWC Charge of Discrimination. Even in the absence of the Lilly Ledbetter Act – which brings Drew's Charge within the limitations period – these events demonstrate Drew was subjected to discrimination within the requisite charge-filing period.

u.    Drew pursued every avenue he could to diligently pursue his rights. As McGriff's corporate representative recognized numerous times in his deposition, Drew followed up on multiple occasions and exercised diligence and acted reasonably throughout the years in trying to figure out why he was not included in the Program. In fact, Mr. Hodo testified he was not sure what else Drew could have done to act diligently to find out why he was excluded from the Program. Thus, similar to the plaintiff in *Rhodes*, Drew had no reason to suspect the reason he was not a part of the Program was due to his age until he discovered McGriff had concealed relevant facts and was actively misleading him in 2021. Accordingly, McGriff should not be allowed to take

16

advantage of its misrepresentations and should be estopped from alleging Drew failed to timely file his discrimination charge.

v.  Even if McGriff was not estopped from asserting a limitations defense, Drew's claims were tolled until 2021 under equitable tolling as Drew was unaware of the facts giving rise to his claim because of McGriff's intentional concealment and misrepresentation of same.

w.  Equitable tolling tolls limitations during the plaintiff's excusable ignorance and is committed to the sound discretion of the judge. *Champlin v. Manpower Inc.*, No. 4:16-CV-00421, 2018 WL 572997, at *4 (S.D. Tex. Jan. 24, 2018). For equitable tolling to apply, a plaintiff must show "(1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way and prevented timely filing." *Id.* (quoting *Menominee Indian Tribe of Wisconsin v. United States*, 577 U.S. 250, 255 (2016)).

x.  The Fifth Circuit has recognized at least three bases for equitable tolling:

(1) the pendency of a suit between the same parties in the wrong forum; (2) plaintiff's unawareness of the facts giving rise to the claim because of the defendant's intentional concealment of them; and (3) the EEOC's misleading the plaintiff about the nature of her rights.

*Granger*, 636 F.3d at 712.

y.  Equitable tolling is to be applied in cases "where purposeful misrepresentations misled a party or where a party could not have vindicated its rights even by exercising due diligence." *Hull v. Emerson Motors/Nidec*, 532 Fed. Appx. 586, 588 (5th Cir. 2013). In pleading equitable tolling, "[a] plaintiff need not prove intentional misconduct by the employer, but must demonstrate that 'the defendant's conduct, innocent or not, reasonably induced the plaintiff to not file suit within the limitations period.'" *Boudreau v. Nokia of Am. Corp.*, No. 3:19-CV-01623-E, 2020 WL 7426155, at *5 (N.D. Tex. Dec. 18, 2020) (quoting *Tyler v. Union Oil Co. of Cal.*, 304 F.3d 379, 391 (5th Cir. 2002)).

z.  Texas law similarly tolls limitations pursuant to fraudulent concealment when a plaintiff proves "an underlying wrong, and that the defendant actually knew the plaintiff was in fact wronged, and concealed that fact to deceive the plaintiff." *Gallier v. Woodbury Fin. Services, Inc.*, 171 F.Supp.3d 552, 563 (S.D. Tex. 2016) (internal quotations omitted). Fraudulent concealment is fact-specific and "tolls limitations until the fraud is discovered or could have been discovered with reasonable diligence." *Valdez v. Hollenbeck*, 465 S.W.3d 217, 229 (Tex. 2015). Indeed, as the Texas Supreme Court noted, "accrual is deferred because a person cannot be permitted to avoid liability for his actions by deceitfully concealing wrongdoing until limitations has run." *S.V. v. R.V.*, 933 S.W.2d 1, 6 (Tex. 1996).

aa.  This case is riddled with instances of McGriff intentionally misrepresenting the reason for denying Drew's participation in the Program. As detailed above, McGriff completely omitted the Program in its communications with Drew even though the Program was included in a memorandum regarding "Producer Retention" just two months earlier. In addition, Drew was

17

told multiple times that he was getting a better deal through Book Equity, rather than Program participation, when in reality membership in both was not mutually exclusive. The list of Program participants is littered with Producers who also received Book Equity. Nor was Drew ever told prior to 2021 that he was not included because of his age, despite McGriff's corporate representative having known since 2012-2015 that that was the very reason for his exclusion. Rather, Drew was told when he received the $50,000.00 loan that that was better than nothing and that was all he would ever be eligible for. Additionally, Drew inquired on multiple occasions about the refusal to include him in the Program and, as McGriff's corporate representative recognized, exercised diligence and acted reasonably throughout the years in trying to figure out why he was not included. Based on these events, there is no conceivable way Drew could have known of all the facts to support his claim due to McGriff's continuous misrepresentations and concealment until he learned in 2021 that McGriff failed to include him and Peter Barbara in the Program due to their age. *See Boudreau*, 2020 WL 7426155, at *5 (denying motion to dismiss as sufficient facts were alleged regarding equitable tolling where it was not until a younger male with less management experience was hired that the plaintiff learned of the facts necessary to support her discrimination charge as the former employer previously misrepresented to plaintiff that she did not receive the promotion due to her lack of management experience.).

bb. Mr. Hodo testified he wouldn't fault Drew for not filing any sort of discrimination claim at the time Drew was told he wasn't in the Program because he purportedly got a better deal by way of Book Equity.

cc. Federal Rule of Civil Procedure 8(c) requires a defendant to affirmatively plead a limitations defense. FED. R. CIV. P. 8(c) ("In responding to a pleading, a party must affirmatively state any avoidance or affirmative defense, including ... statute of limitations ... ."); *see also Razo v. State Farm Lloyds*, No. 7:17-CV-00352, 2017 WL 6209608, at *2 (S.D. Tex. Dec. 8, 2017) ("Rule 8(c) requires a defendant to affirmatively plead its limitations defense, and thus the general rule is that such a failure constitutes waiver of the defense."). Thus, a limitations defense, such as the failure to exhaust administrative remedies by not timely filing a charge, "is an affirmative defense that should be pleaded." *Davis v. Fort Bend Cnty.*, 893 F.3d 300, 308 (5th Cir. 2018), *aff'd*, 139 S. Ct. 1843 (2019); *see also Thomas v. Dallas Indep. Sch. Dist.*, No. 3:22-CV-2685-G-BN, 2023 WL 4687225, at *3 (N.D. Tex. May 31, 2023) (citing same rule for claims that included an ADEA claim); *Johnson v. San Jacinto Coll.*, No. 4:20-CV-2948, 2021 WL 40323, at *2 (S.D. Tex. Jan. 5, 2021) (Texas law similarly holds that § 21.202 "creates a statute of limitations defense to a TCHRA claim when the administrative charge is not filed within 180 days of the act alleged to be an unlawful employment practice."). The Fifth Circuit, however, has recognized that failure to raise an affirmative defense under Rule 8(c) in a party's first responsive pleading is not fatal if the defense is raised "at a pragmatically sufficient time, and [the plaintiff] was not prejudiced in its ability to respond." *Allied Chem. Corp. v. Mackay,* 695 F.2d 854, 856 (5th Cir.1983). "Unfair surprise and prejudice are central concerns underlying the requirement that a defendant timely plead affirmative defenses." *LSREF2 Baron, L.L.C. v. Tauch*, 751 F.3d 394, 402 (5th Cir. 2014).

dd. McGriff contends Drew missed his charge-filing deadline. However, McGriff failed to plead this defense in any live pleading. It has been more than a year since McGriff filed its Answer

18

in this case and it has failed to raise any affirmative defenses despite having an opportunity to do so prior to removing this case as well as during the 21-day period it was allowed to do so as a matter of course under the Federal Rules. FED. R. CIV. P. 81(c).

ee.  Drew seeks recovery of reasonable and necessary attorneys' fees and costs pursuant to § 21.259 of the Texas Labor Code as well as 29 U.S.C. § 216(b).

ff.  In assessing the reasonableness of fees sought by Drew in this lawsuit, courts apply the two-step method required by the Fifth Circuit.  First, the 'lodestar' is determined by multiplying the number of hours reasonably spent on the litigation times a reasonable hourly billing rate. *Watkins v. Fordice*, 7 F.3d 453, 457 (5th Cir. 1993).  Once the number of reasonable hours is established, those hours are "then multiplied by the selected hourly rate to produce the 'lodestar.'" *Alberti v. Klevenhagen*, 896 F.2d 927, 930 (5th Cir. 1990).  In determining the reasonable hourly rate, courts dictate that "an appropriate hourly rate" must be selected "based on prevailing community standards for attorneys of similar experience in similar cases." *Blum v. Stenson*, 465 U.S. 886, 896 n. 11, 104 S.Ct. 1541 (1984); *Alberti*, 896 F.2d at 930.  The second step in assessing attorneys' fees requires application of various factors identified by courts within the Fifth Circuit to determine what amount is warranted.  The lodestar may be adjusted up or down if relevant factors indicate an adjustment is necessary to reach a reasonable fee in the case.  The Fifth Circuit has identified twelve factors – often referred to as the *Johnson* factors -- a district court should be guided by: (1) the time and labor required; (2) the novelty and difficulty of the issues in the case; (3) the skill requisite to perform the legal services properly; (4) the preclusion of other employment by the attorney due to acceptance of the case; (5) the customary fee charged for those services in the relevant community; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the undesirability of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases.  *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714, 717-19 (5th Cir. 1974). Many of the *Johnson* factors are usually subsumed within the initial calculation of hours reasonably expended at a reasonable hourly rate.  In fact, the lodestar may not be adjusted due to a *Johnson* factor if the lodestar calculation already took that factor into account.  *Watkins v. Input/Output, Inc.*, 531 F. Supp. 777, 784 (S.D. Tex. 2007).

gg.  Drew is more than 40 years of age.

hh.  McGriff has more than 500 employees.

ii.  Drew was qualified to be included in the Program.

jj.  Drew suffered an adverse employment action by not being included in the Program.

kk.  McGriff employees who are outside the protected age class were treated more favorably than Drew by being included in the Program.

ll.  McGriff intentionally discriminated against Drew.

mm. Drew's age was a motivating factor in, and/or but for cause of, McGriff's decision to exclude him from the Program.

nn.  McGriff's stated reasons for excluding Drew are false and pretext for age discrimination.

oo.  As a result of McGriff's intentional unlawful actions, it violated Chapter 21 of the Texas Labor Code and the Age Discrimination in Employment Act when it discriminated against Drew because of his age.

pp.  As a direct and proximate result of the conduct of McGriff, Drew has suffered injury.

qq.  For the injuries Drew has suffered, he seeks compensatory and consequential damages.

rr.  Because McGriff acted with malice or reckless indifference to Drew's state-protected rights, he is also entitled to punitive damages.  See Tex. Lab. Code § 21.2585.

ss.  Because McGriff acted willfully, Drew is also entitled to liquidated damages.  *See* 29 U.S.C. § 626(b).

tt.  An Employer acts willfully when it "knew or showed reckless disregard' for whether the ADEA prohibited its conduct."  *Hazen Paper Co. v. Biggins*, 507 U.S. 604, 615 (1993).

uu.  Drew seeks recovery of all applicable pre- and post-judgment interest.

vv.  Any propositions of fact identified by Plaintiff that the Court concludes are more accurately considered propositions of law.

## DEFENDANT

a.  "The burden of persuasion does not shift to the employer to show that it would have taken the actions regardless of age, even where a plaintiff has produced some evidence that age was one motivating factor in that decision." *Gross*, 557 U.S. at 180.

b.  The ADEA also provides that "[n]o civil action may be commenced by an individual under this section until 60 days after a charge alleging unlawful discrimination has been filed with the Equal Employment Opportunity Commission. Such a charge shall be filed (A) within 180 days after the alleged unlawful practice occurred; or (B) in a case to which section 633(b) of this title applies, within 300 days after the alleged unlawful practice occurred[.]" 29 U.S.C. § 626(d)(1)(A)-(B).

c.  Under the ADEA, "the Fifth Circuit has expressly rejected the notion that a Title VII discrimination claim – and its attendant pre-suit requirements period – begins to accrue when the plaintiff learns of discriminatory intent ,as opposed to the discriminatory act itself." *Li v. Univ. of Tex. Rio Grande Valley*, No. 7:15-CV- 00534, 2018 WL 706472, at *5 (S.D. Tex. Feb. 2, 2018) (citing, *inter alia, Merrill v. Southern Meth. Univ.*, 806 F.2d 600, 605 (5th Cir. 1986) (limitations period begins to run when a plaintiff knows or reasonably should know that the

discriminatory act has occurred, not when he or she first perceives that a discriminatory motive caused the act)). *See, e.g., Foster v. United Rentals (North America), Inc.*, No. 2:16-CV-114, 2018 WL 1474186, at *3 (S.D. Tex. March 9, 2018) (applying same principle to ADEA claim).

d. ADEA claims "based on discrete acts cannot rely on a continuing violation theory." *Heath v. Bd. of Supervisors for Southern Univ. and Agricultural and Mech. College*, 850 F.3d 731, 741-742 (5th Cir. 2017) (citing *Nat'l RR. Passenger Corp. v. Morgan*, 536 U.S. 105, 113 (2004)). *See, e.g. Simmons-Myers v. Caesars Ent. Corp.*, 515 F. App'x 269, 273 (5th Cir. 2013) ("discrete discriminatory acts are not entitled to the shelter of the continuing violation doctrine").

e. Under the ADEA, "multiple discrete acts of discrimination during" an employee's tenure do not collectively constitute "one 'unlawful employment practice.'" *Lucenio v. Houston I.S.D.*, No. 4:21-cv-00650, 2022 WL 658838, at *12 (S.D. Tex. Feb. 16, 2022) (quoting *Morgan*, 536 U.S. at 117)).

f. "Equitable tolling applies to statutes of limitations because the statute of limitations 'encourages the plaintiff to pursue his rights diligently' and does not have its purpose furthered 'when an extraordinary circumstance prevents [a plaintiff] from bringing a timely action.'" *Middaugh v. InterBank*, 528 F. Supp. 3d 509, 527 (N.D. Tex. 2021) (quoting *CTS Corp. v. Waldburger*, 573 U.S. 1, 10 (2014)). "Therefore, the discovery rule does not apply unless 'the nature of the injury incurred is inherently undiscoverable.'" *Id.* (quoting *Beavers v. Metro. Life Ins. Co.*, 566 F.3d 436, 439 (5th Cir. 2009)).

g. "Equitable tolling is to be applied sparingly." Manning v. Chevron Chem. Co., LLC, 332 F.3d 874, 880 (5th Cir. 2003) (quoting Nat'l RR Passenger Corp. v. Morgan, 536 U.S. 101, 113 (2002)).

h. "[E]quitable tolling might apply due to fraudulent concealment where 'the defendants concealed the conduct complained of, and . . . the plaintiff failed, despite the exercise of due diligence on his part, to discover the facts that form the basis of his claim.'" *Id.* (quoting *Texas v. Allan Const. Co., Inc.*, 851 F.2d 1526, 1528 (5th Cir. 1988)) (alterations original).

i. The Lilly Ledbetter Fair Pay Act of 2009 redefined "occurrence" for the ADEA to say that "an unlawful employment practice occurs, with respect to discrimination in compensation . . . when a person is affected by application of a discriminatory compensation decision or other practice, including each time wages, benefits, or other compensation is paid, resulting in whole or in part from such a decision or other practice." 29 U.S.C. § 626(d)(3).

j. The Code provides that "a person claiming to be aggrieved by an unlawful employment practice . . . may file a complaint with" the Texas Workforce Commission—Civil Rights Division." Tex. Lab. Code § 21.201. With the exception of sexual harassment complaints, "a complaint under this subchapter[1] must be filed not later than the 180th day after the date the alleged unlawful employment practice occurred." *Id.* § 21.202(a). "The commission shall dismiss an untimely complaint." *Id.* § 21.202(b). The charging party becomes entitled to a

21

"notice of right to file a civil action" 180 days after filing a complaint, and must file that civil action (a) within 60 days of receiving the notice of rights letter *and* (b) within two years of filing the complaint. *Id.* §§ 21.252, 21.254, 21.256.

k.  Under Texas law, the 180-day limitations period "begins to run when the employee is informed of the allegedly discriminatory employment decision." *Ajayi v. Walgreen Co.*, 562 F. App'x 243, 246 (5th Cir. 2014) (citing *Specialty Retailers, Inc. v. DeMoranville*, 933 S.W.2d 490, 493 (Tex. 1996)). Just as it is "well established in this circuit that in age discrimination cases the limitations period begins to run when the plaintiff knows of the discriminatory *act*, not when he first perceives the discriminatory motive . . . Texas courts of appeals have adopted this position." *Ajayi*, 562 F. App'x at 246 (citing *Ogletree v. Glen Rose Indep. Sch. Dist.*, 314 S.W.3d 450, 455 (Tex. App.—Waco 2010, pet. denied); *Acosta v. Memorial Hermann Hosp. Sys.*, No. 14-07-00001-CV, 2008 WL 198852, at *4 (Tex. App.—Houston [14th Dist.] Jan. 22, 2008, pet. denied); *Abbott v. Rankin*, No. 06-07-00149-CV, 2008 WL 5156453, at *3 (Tex. App—Texarkana Dec. 10, 2008, pet. denied)).

l.  The Texas Labor Code does not have an expanded definition of "occurrence" for compensation discrimination claims. Indeed, the Texas Labor Code does not define "occurrence" at all. *Prairie View A & M Univ. v. Chatha*, 381 S.W.3d 500, 506-507 (Tex. 2012). Case law provides that an "occurrence" happens, and the limitations period begins to run, when the employee is informed of the allegedly discriminatory employment decision. *Id.* (citing *Specialty Retailers, Inc. v. DeMoranville*, 933 S.W.2d 490, 493 (Tex. 1996)).

m.  "The 180-day limitations period for an employment discrimination complaint begins when the employee is informed of the allegedly discriminatory decision, not when that decision comes to fruition. The date of the discriminatory act controls, *not some later date when the employee discovers that the act is discriminatory*." *Abbott v. Rankin*, No. 06-07-00149-CV, 2008 WL 5156453, at *3 (Tex. App.— Texarkana Dec. 10, 2008, pet. denied) (citations omitted). *See, e.g.*, *Gilles- Gonzalez v. Univ. of Tex. Sw. Med. Ctr.*, No. 05-16-00078-CV, 2016 WL 3971411, at *4 (Tex. App.—Dallas July 22, 2016, no pet.) ("limitations period begins to run on the date the discriminatory act occurred, not on the date the victim first perceives that a discriminatory motive caused the act") (citing *Merrill*, 806 F.2d at 605); *Ogletree v. Glen Rose I. S. D.*, 314 S.W.3d 450, 455 (Tex. App.—Waco 2010, pet. denied) (relying on *Merrill* and holding that the statute of limitations for employment discrimination claims runs from the date of occurrence, not the date of discovery of discriminatory intent).

n.  An aggrieved party must file a charge of discrimination with the Texas Workforce Commission, and by law, "the commission shall dismiss an untimely complaint." *Id.* This 180-day filing deadline, while not jurisdictional, is "mandatory." *Hinkley v. Envoy Air, Inc.*, 968 F.3d 544, 553 (5th Cir. 2020). Failure to timely satisfy the administrative-exhaustion requirement bars recovery and warrants dismissal of any civil action not preceded by a timely written complaint. *Id.* at 552, 555.

o.  Under Texas law, the "continuing violation doctrine applies when an unlawful employment practice manifests itself over time, rather than as a series of discrete acts." *Davis v. Autonation*

*USA Corp.*, 226 S.W.3d 487, 493 (Tex. App.—Houston [1st Dist.] 2006, no pet.). In some instances, "equitable considerations may require that the filing period not begin until acts supportive of a civil rights action are, or should be, apparent to a reasonably prudent person in the same or a similar position." *Id.* (quoting *Wal-Mart Stores v. Davis*, 979 S.W.2d 30, 31 (Tex. App.— Austin 1998, pet. denied)). The "touchstone" in determining whether to apply the continuing violation doctrine is "whether [the] employee was put on notice that his rights had been violated." *Id.* (citing *Hackabay v. Moore*, 142 F.3d 233, 239 (5th Cir. 1998)). *See White v. United Parcel Serv., Inc.*, No. H-20-2813, 2021 WL 4941998, at *7 (S.D. Tex. Oct. 22, 2021) (citing and applying *Davis*).

p.  When sitting in diversity (as the Court is for purposes of Drew's Texas Labor Code claim), "federal courts must abide by a state's tolling rules, which are integrally related to statutes of limitations." *Labaty v. UWT, Inc.*, 121 F. Supp. 3d 721, 742-743 (W.D. Tex. 2015) (quoting *Albano v. Shea Homes Ltd. P'ship*, 634 F.3d 524, 530 (9th Cir. 2011)).

q.  Under Texas law, "equitable tolling is a 'sparingly' used doctrine." *Hand v. Stevens Transp., Inc. Employee Benefit Plan*, 83 S.W.3d 286, 293 (Tex. App.—Dallas 2002, no pet.) (quoting *Irwin v. Dep't of Veterans Avairs*, 498 U.S. 89, 96 (1990)). For example, "courts will apply the equitable tolling doctrine in misidentification cases where applying the statute of limitations would not serve its legitimate purpose." *Torres v. Johnson*, 91 S.W.3d 905, 909 (Tex. App.— Fort Worth 2002, no pet.).

r.  The "purpose of statutes of limitations is to compel the assertion of claims within a reasonable period so that the opposite party has a fair opportunity to defend while witnesses are available and the evidence if fresh in their minds." *Id.* at 908 (citing *Computer Assocs. Int'l, Inc. v. Altai, Inc.*, 918 S.W.2d 453, 455 (Tex. 1996)).

s.  In Texas, "the discovery rule" may delay accrual or toll limitations, and applies "on a categorical basis to injuries that are both inherently undiscoverable and objectively verifiable." *Valdez v. Hollenbeck*, 465 S.W.3d 217, 229 (Tex. 2015). Similar to federal precedent, "fraudulent concealment is a fact-specific equitable doctrine that tolls limitations until the fraud is discovered or could have been discovered with reasonable diligence." *Id.* at 229 (citing *Shell Oil Co. v. Ross*, 356 S.W.3d 924, 927 (Tex. 2011)).

t.  "The estoppel effect of fraudulent concealment ends when a party learns of facts, conditions, or circumstances which would cause a reasonably prudent person to make inquiry which, if pursued, would lead to the discovery of the concealed cause of action." *Borderlon v. Peck*, 661 S.W.2d 907, 909 (Tex. 1982). "Knowledge of such facts is in law equivalent to knowledge of the cause of action." *Id.*

u.  The Texas Supreme Court has made clear that the Lilly Ledbetter Fair Pay Act is not incorporated by reference into the Texas Labor Code. *Prairie View A & M Univ. v. Chatha*, 381 S.W.3d 500, 507-508 (Tex. 2012) (explaining, in the specific context of the Ledbetter Act, that the "general purposes provision" of the Texas Commission on Human Rights Act, which states that one of the purposes of the TCHRA is to provide for the "execution of the policies of Title

23

VII . . . and its subsequent amendments" does ***not*** mean that all amendments are automatically incorporated into the TCHRA). *See, e.g.*, *Blasingame v. Eli Lilly and Co.*, No. H- 11-4522, 2013 WL 5705234, at *5 (S.D. Tex. Oct. 18, 2013) (citing *Chatha* and holding that the Lilly Ledbetter Fair Pay Act "does not act to extend the time for filing claims under the TCHRA").

v.   Under the Texas Labor Code, "in a complaint in which the complainant proves a violation under Subsection (a)," i.e., proves that age or another impermissible consideration was motivating factor for an employment practice, "and a respondent demonstrates that the respondent would have taken the same action in the absence of the impermissible motivating factor, the court may grant declaratory relief, injunctive relief except as otherwise provided by this subsection, and attorney's fees and costs demonstrated to be directly attributable only to the pursuit of a complaint under Subsection (a), but may not award damages or issue an order requiring an admission, reinstatement, hiring, promotion, or back pay." Tex. Lab. Code § 21.215(b) (emphasis added).

w.   The Texas Labor Code specifically authorizes awards of attorneys' fees: "in a proceeding under this chapter, a court may allow a prevailing party, other than [the Texas Workforce Commission], a reasonable attorney fee as part of the costs." Tex. Lab. Code § 21.259(a).

## 10.  <u>Exhibits</u>

A.  On a separate form similar to the one provided by the Clerk, each party has attached four lists of all exhibits expected to be offered and will make the exhibits available for examination by opposing counsel.    All documentary exhibits must be exchanged before trial, except for rebuttal exhibits or those whose use cannot be anticipated.

> **Four Copies of Plaintiff's Exhibit List are attached as Exhibit 1.**

> **Four Copies of Defendant's Exhibit List are Attached to its Proposed Pretrial Order as Exhibit A.**

B.  The Parties acknowledge that each party requiring authentication of an exhibit must notify the offering counsel in writing within five days after the exhibit is listed and made available; failure to object in writing in advance of the trial concedes authenticity.

C.  Within reason, other objections to admissibility of exhibits must be made at least three business days before trial; the Court will be notified in writing of disputes, with copies of the disputed exhibit and authority.

## 11.   <u>Witnesses</u>

A.   On a separate form, each party has attached four lists with the names and addresses of witnesses who may be called with a brief statement of the nature of their testimony.

**Four Copies of Plaintiff's Witness List are Attached as Exhibit 2.**

**Four Copies of Defendant's Witness List are Attached to its Proposed Pretrial Order as Exhibit B.**

B.    If other witnesses to be called at the trial become known, their names, addresses, and subject of their testimony will be reported to opposing counsel in writing as soon as they are known; this does not apply to rebuttal or impeachment witnesses.

12.    **Settlements**

Counsel for the parties have exchanged  settlement offers, but the parties are very far apart.

13.    **Trial**

The parties anticipate that trial will take two to three days and do not foresee any logistical problems of the type mentioned in the Court's template joint pretrial order.

14.    **Attachments**

Plaintiff's proposed findings of fact are attached in duplicate as Exhibit 3 and have also been filed separately.

Plaintiff's proposed conclusions of law with authority are attached in duplicate as Exhibit 4 and have also been filed separately.

Defendant's proposed findings of fact are attached in duplicate as Exhibit C to its Proposed Pretrial Order and have also been filed separately.

Defendant's proposed conclusions of law with authority are attached in duplicate as Exhibit D to its Proposed Pretrial Order and have also been filed separately.

Approved:

_____    Date: _DECEMBER 28, 2023_
Attorney-in-Charge, Plaintiff


_____    Date: _____
Attorney-in-Charge, Defendant

4863-9768-8217.1

Respectfully submitted,

**GRAY REED**

By: _____

Jay Aldis
Texas State Bar No. 00785656
1300 Post Oak Blvd., Suite 2000
Houston, Texas 77056
Telephone: (713) 986-7175
Fax: (713) 986-7100
jaldis@grayreed.com

**ATTORNEYS FOR PLAINTIFF**
**JOHN DREW**

## CERTIFICATE OF SERVICE

I hereby certify that on the _____ day of December 2023, a copy of the foregoing document

was served on counsel of record by the Court's electronic filing system.

_____

Jay Aldis

26

4863-9768-8217.1