*EXHIBIT 3*

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| PETER BARBARA and JOHN DREW, | § | |
| | § | |
| *Plaintiffs*, | § | |
| | § | |
| v. | § | |
| | § | CIVIL ACTION NO. 4:22-CV-03340 |
| MCGRIFF INSURANCE SERVICES, INC., | § | |
| | § | |
| | § | |
| *Defendant.* | § | |

## PLAINTIFF JOHN DREW'S PROPOSED FINDINGS OF FACT

Plaintiff John Drew files these Proposed Findings of Fact and respectfully shows the Court the following:

1. John Drew is 81 years old. He has been in the commercial insurance business for five decades.

2. In 2002, Drew was a Producer in Dallas for a company called Marsh. At that time, he was approached by McGriff about coming to work for them. After several months of discussions and negotiations, Drew signed an offer letter and employment agreement and began working for McGriff on August 2, 2002. Neither the offer letter nor employment agreement preclude Drew from participating in any payment programs at McGriff. His title was Senior Vice President and he reported directly to Executive Vice President Doug Hodo, whose supervisor was Tommy Ebner, CEO of McGriff Texas. Mr. Ebner reported to McGriff's Chairman, Bruce Dunbar.

3. In 2004, Drew became the head of the Dallas office. In that role, he supervised approximately eight Producers and a staff of 65 to 70 employees. He had the largest book

1

of business in the Dallas office and the twelfth largest book in the entire company. By 2008, the book had grown to $2,764,332.15.

4. Drew has never had any disciplinary issues or demonstrated any poor citizenship at McGriff. He and Peter Barbara (one of the two initial Plaintiffs in this lawsuit who has settled his claims with McGriff) were the two oldest Producers at the Company.

5. On February 2, 2008, McGriff's Chairman, Bruce Dunbar, issued a Memorandum regarding "Producer Retention" to eight members of the Company's leadership team, including the heads of its offices in Atlanta, Birmingham and Houston. Notably, Drew was not a recipient of the memo -- even though he was the head of the Dallas Office -- and did not see it until this litigation. The memorandum stated at page one:

> As you are aware, we are ready to communicate our Producer Retention program to all producers. I am very pleased with the various incentives we have been able to include and the overall magnitude our producer compensation package. In order to clearly communicate the appropriate message to all parties, I wanted to summarize the key talking points of this package and a general discussion of the tools we have available.

6. The document then identified <u>five</u> retention compensation programs – Annual Earn-Out Bonus, Out of Park Bonus, Restricted Stock Grants, Forgivable Producer Loans and Book Equity. As to Forgivable Producer Loans, page two of the memorandum said:

> This is a key component of the program ... . We have over $21 million in available loan money. We made the first loans in December 2007 and the balance will be made available over the next few months. Each loan is forgivable over a 10-year period. Which cannot be shortened.[1] The size of the production book determines the eligibility for a producer loan. At $1 million, a producer is eligible for a $200,000 loan. At each increase of $500,00 in book size, the producer is eligible for an additional $100K loan. As an example, a producer with a $3.2 million book is eligible for a loan of up to

---

[1]    Despite the reference to the ten-year period not being shortened, it actually has been in several instances. Due to competitors offering shorter periods, and changes in tax laws, the period has been reduced to as little as four years.

$600K.  When his book exceeds $3.5 million, he is eligible for an additional $100K loan.

7.  Two months later, on April 24, 2008, Mr. Dunbar sent a letter to Drew.  The first paragraph stated:

> We appreciate and value your contribution to McGriff, Seibels & Williams, Inc.  Accordingly, we have prepared this outline of traditional and retention compensation along with the attached exhibit to communicate and illustrate the various types and amounts of rewards, which the company makes available to you.

8.  The letter then falsely stated that McGriff's "retention compensation" was composed of only <u>four</u> cash compensation and stock grants and options: Earn Out Bonus, Out of Park Bonus, Restricted Stock and Book Equity.  Remarkably, the letter made no mention of the Forgivable Producer Loans which are the subject of this lawsuit.

9.  Later in 2008, Drew became aware of the existence of the Forgivable Producer Loan Program (the "Program").  Drew only knew a Program existed but did not know how it operated.  He called McGriff's CFO, Tom Lambert, and asked why he hadn't been included.  Lambert falsely assured Drew that his participation "would come along later." It didn't, so Drew continued, over and over again, to inquire about his exclusion.

10. In 2009, at a conference at the Marriott hotel in Point Clear, Alabama, Drew pulled Bruce Dunbar aside and asked him why he hadn't received anything from the Program.  Similar to Lambert, Dunbar provided a false front and told Drew he had a better deal because Drew was going to receive Book Equity for five years once he retired.  But that was not true, as Book Equity was apparently provided to all producers, including several who were put in the Program.

3

11. When another year or two passed and nothing happened, Drew talked with Tommy Ebner about being included in the Program. When that went nowhere, Drew tried getting some relief from Doug Hodo. Hodo was sympathetic and told Drew, "it wasn't right," because he should be in the Program. He assured Drew he would do what he could about the situation. But the half-dozen or so conversations Drew had with Hodo over the course of the next four to five years still didn't move the needle. Mr. Hodo's response each time they spoke was that he simply couldn't get anything done.

12. So, Drew reached out to Mr. Ebner again in 2012 and they met in the Dallas office. Mr. Ebner said he would look into things. Again, Drew heard nothing, so he called Mr. Ebner later that year but received no response to his phone message. In 2015, Drew actually flew down to Houston to see Mr. Ebner about the Program. Mr. Ebner told Drew that his participation in the Program was something he and Mr. Dunbar had actually talked about a lot but Drew's inclusion in Book Equity, rather than inclusion in the Program was what "we think is best for you. But that, too, was false, because Book Equity participation and Program participation were clearly not mutually exclusive.

13. During the time period of 2012-2015, Mr. Hodo asked Mr. Ebner to go directly to Mr. Dunbar (who actually made all the decisions of who was included in the Program) and ask why Drew had been excluded. Ebner did so, and Dunbar's response was, "Drew and [former Plaintiff] Pete Barbara didn't get in because they were too old, and this was a retention program to keep the young producers."  Despite knowing of these comments by Dunbar and believing Drew was treated unfairly with respect to the Program, Mr. Hodo never reported them to Drew and Drew only learned of them during this litigation. When asked why he didn't tell Drew or Barbara what Mr. Dunbar had said, Mr. Hodo responded,

4

"Not sure." When asked if he was fearful he would be retaliated against by Mr. Dunbar, Mr. Hodo responded, "Not sure."

14. Nevertheless, Mr. Drew's 2015 meeting with Mr. Ebner apparently did finally spur him into action. On December 18, 2015, Mr. Ebner sent an e-mail to CFO Tom Lambert with a subject line of "john Drew." The e-mail stated:

> John is following up on the meeting we (he and I) had in the summer about not getting a loan like the others, still in the game supporting company, having great years in new etc. You and I discussed about what we might be able to do as a one off and deferred discussion etc. John has followed up today and I just told him it was "on the list." Please put this on your Christmas/year end list as well. Thanks.

15. Five days later, Lambert responded by e-mail, apparently admitting Drew should have been made part of the program all along. The e-mail said:

> [w]e can give him some cash from the Great Performers bonus pool (say 25% to 50% of the amount of any loans he missed) in 2016 or we can give him a loan during the next cycle. Perhaps we can do for him what we did for Bob Verdin ... 50% of the qualifying loan amount to be forgiven over 5 years or 1/3 of the qualifying loan amount to be forgiven over 3 years.

16. On April 18, 2016, Lambert sent Drew an e-mail regarding his participation in the Program. It stated, "Congratulations on being selected to receive a producer retention loan! I have attached the loan document for your review and execution." The e-mail was accompanied by a Promissory Note in which Drew was provided a loan of only $50,000, which would be paid in five $10,000 annual installments through May 1, 2021, and was forgivable if he did not voluntarily terminate his employment or his employment was not terminated by McGriff for "Cause" during those five years.

17. Doug Hodo, who had been pushing for Drew's full participation in the Program, was disappointed by the meager payment of $50,000, particularly given Drew's production and all his contributions to McGriff. He contacted Drew and told him he was "embarrassed" the

5

Company paid him only $50,000. Mr. Hodo added that he was "sorry," he had tried his best, $50,000 was all Drew was ever going to get out of the Program, and at least $50,000 was "better than nothing." When asked in his deposition if he believed Drew was paid the $50,000 in 2016 in order to keep him quiet and not have to deal with him anymore, Hodo responded, "Not sure."

18. Faced with the certainty there was nothing else he could do, the die had been cast on his Program participation, and $50,000 was all he was ever going to get, Drew ceased any further efforts to be included in the Program. From that point on, it wasn't until this litigation that McGriff provided him any visibility into whether any other Producers were receiving anything from the Program.

19. On September 14, 2021, former Plaintiff Peter and Barbara and Drew dual-filed their Charges of Discrimination with the Equal Employment Opportunity Commission and Texas Workforce Commission – Civil Rights Division. In response to the Charges, McGriff submitted two Position Statements in or about September 2021. The Statements were very telling. Most notably, they did not deny Dunbar said he chose to exclude Barbara and Drew because they were "too old," and the Program was meant for retention of "the young guys." Respondent's Position Statement simply ignored the fact those statements were made. Moreover, the Position Statements provided a host of explanations for Barbara and Drew's exclusion that were completely at odds with explanations McGriff had previously submitted. For instance, Ulmer had told Barbara the Program was created to "attract employees to join our organization" and added that "[w]hen new compensation vehicles are put in place for new employees, we can't renegotiate employment compensation with existing hires." Yet, in the Position Statements, McGriff turned that explanation on its head, instead stating:

McGriff's Producer Loan Program ("Program") was created in or about 2008. The Program was put in place to <u>retain</u> McGriff Producers with more than a [sic] one million dollars in their books of business.

20. Thus, according to McGriff in April 2021, the Program was a recruitment vehicle; however, as of September 2021, their story had become that it was a retention tool. McGriff has contradicted its reason on numerous occasions. Those reasons are all false and pretext for age discrimination.

21. McGriff contends, apparently based on Drew's initial Interrogatory Responses, that he is seeking damages only for being excluded from the Program in 2008. However, those responses were based on Drew's belief at that time that a person could receive only one Forgivable Producer Loan. However, since that time, he has learned -- as the record indisputably shows -- that McGriff provided many people multiple Forgivable Producer Loans. Particularly given the testimony of Doug Hodo that he knows of nothing that precluded Drew from being eligible to participate in the Program as recently as 2023, he now realizes his previous Interrogatory Responses were incorrect and has supplemented those responses.

22. McGriff's own corporate representative testified he did not know of anything that would have precluded Drew from participating in the Program in the same years as Marc Boots, who was a younger employee given a loan under the Program in 2008, 2009, 2014, 2016, 2018, 2019, 2020, 2021, and 2023. McGriff's corporate representative also testified he did not know of any reason why Drew was not included in the Program other than his age and agreed every time Drew was not made a part of the Program, other people younger than him were, which, of course, caused his compensation to be less than those younger participants. Thus, every

7

time McGriff paid these other similarly situated but younger employees pursuant to the Program, but not Drew, Drew's discrimination claim renewed.

23. The Promissory Note Drew signed in May 2016 for the loan he finally received indicated he would be paid in five $10,000.00 installments through May 1, 2021. These installments were approximately 1/10[th] of what he should have received, and other younger Producers did receive, pursuant to the Program formula.    Therefore, Drew was subjected to age discrimination through at least May 2021, which is well within 180 days of September 2021, when he filed his EEOC/TWC Charge of Discrimination.

24. Doug Hodo testified that the Program did not require an increase to the next threshold to receive another loan under the Program.  Mr. Hodo also testified he knows of nothing that would have precluded Drew from being eligible to participate in the Program in every year in which loans have been issued, including 2008, 2009, 2014, 2016, 2018, 2019, 2020, 2021 and 2023.   McGriff produced hundreds of Promissory Notes in discovery related to participation in the Program.  Of the 117 participants identified in the Promissory Notes, 80 received numerous loans under the Program.  And of the 37 who did not, eight only joined the Program in 2023, so they haven't yet had the opportunity to be granted multiple loans.

25. McGriff's corporate representative also testified he did not know of any reason why Drew was not included in the Program other than his age and agreed every time Drew was not made a part of the Program, other people younger than him were, which, of course, caused his compensation to be less than those younger participants.  Thus, every time McGriff paid these other similarly situated but younger employees pursuant to the Program, but not Drew, Drew's discrimination claim renewed.

26. Mr. Hodo went on to testify that (1) he and his supervisor Tommy Ebner – the CEO for McGriff Texas – both thought Drew should have been made part of the program, (2) he knows of no one better qualified than Drew to be in the program, (3) Drew is indisputably better qualified for inclusion based on his book of business than many others who are younger but have nevertheless been made part of the program, and (4) he knows of nothing that disqualifies Drew from participation.

27. To this day, Drew remains employed by McGriff as an Executive Vice President and Producer.

28. Drew is more than 40 years of age.

29. McGriff has more than 500 employees.

30. Drew was qualified to be included in the Program.

31. Drew suffered an adverse employment action by not being included in the Program.

32. McGriff employees who are outside the protected age class were treated more favorably than Drew by being included in the Program.

33. McGriff intentionally discriminated against Drew.

34. Drew's age was a motivating factor in, and/or but for cause of, McGriff's decision to exclude him from the Program.

35. McGriff's stated reasons for excluding Drew are false and pretext for age discrimination.

36. As a result of McGriff's intentional unlawful actions, it violated Chapter 21 of the Texas Labor Code and the Age Discrimination in Employment Act when it discriminated against Drew because of his age.

37. As a direct and proximate result of the conduct of McGriff, Drew has suffered injury.

38. For the injuries Drew has suffered, he seeks compensatory and consequential damages.

9

39. Because McGriff acted with malice or reckless indifference to Drew's state-protected rights, he is also entitled to punitive damages.

40. Because McGriff acted willfully because it "knew or showed reckless disregard' for whether the ADEA prohibited its conduct," Drew is also entitled to liquidated damages.

41. Drew seeks recovery of all applicable pre- and post-judgment interest.

42. Any propositions of law identified by Plaintiff that the Court concludes are more accurately considered propositions of law.

Respectfully submitted,

**GRAY REED**

By: _____

Jay Aldis
Texas State Bar No. 00785656
1300 Post Oak Blvd., Suite 2000
Houston, Texas 77056
Telephone: (713) 986-7175
Fax: (713) 986-7100
jaldis@grayreed.com

**ATTORNEYS FOR PLAINTIFF**
**JOHN DREW**

10

4893-3999-6313.1

## CERTIFICATE OF SERVICE

I hereby certify that on the ___25th___ day of December 2023, a copy of the foregoing document was served on counsel of record by the Court's electronic filing system.

Jay Aldis

11

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| PETER BARBARA and JOHN DREW, | § | |
| | § | |
| *Plaintiffs*, | § | |
| | § | |
| v. | § | |
| | § | CIVIL ACTION NO. 4:22-CV-03340 |
| MCGRIFF INSURANCE SERVICES, INC., | § | |
| | § | |
| | § | |
| *Defendant*. | § | |

## PLAINTIFF JOHN DREW'S PROPOSED FINDINGS OF FACT

Plaintiff John Drew files these Proposed Findings of Fact and respectfully shows the Court the following:

1. John Drew is 81 years old.  He has been in the commercial insurance business for five decades.

2. In 2002, Drew was a Producer in Dallas for a company called Marsh.  At that time, he was approached by McGriff about coming to work for them. After several months of discussions and negotiations, Drew signed an offer letter and employment agreement and began working for McGriff on August 2, 2002.  Neither the offer letter nor employment agreement preclude Drew from participating in any payment programs at McGriff.  His title was Senior Vice President and he reported directly to Executive Vice President Doug Hodo, whose supervisor was Tommy Ebner, CEO of McGriff Texas.  Mr. Ebner reported to McGriff's Chairman, Bruce Dunbar.

3. In 2004, Drew became the head of the Dallas office.   In that role, he supervised approximately eight Producers and a staff of 65 to 70 employees.  He had the largest book

1

4893-3999-6313.1

of business in the Dallas office and the twelfth largest book in the entire company. By 2008, the book had grown to $2,764,332.15.

4.  Drew has never had any disciplinary issues or demonstrated any poor citizenship at McGriff. He and Peter Barbara (one of the two initial Plaintiffs in this lawsuit who has settled his claims with McGriff) were the two oldest Producers at the Company.

5.  On February 2, 2008, McGriff's Chairman, Bruce Dunbar, issued a Memorandum regarding "Producer Retention" to eight members of the Company's leadership team, including the heads of its offices in Atlanta, Birmingham and Houston. Notably, Drew was not a recipient of the memo -- even though he was the head of the Dallas Office -- and did not see it until this litigation. The memorandum stated at page one:

> As you are aware, we are ready to communicate our Producer Retention program to all producers. I am very pleased with the various incentives we have been able to include and the overall magnitude our producer compensation package. In order to clearly communicate the appropriate message to all parties, I wanted to summarize the key talking points of this package and a general discussion of the tools we have available.

6.  The document then identified <u>five</u> retention compensation programs – Annual Earn-Out Bonus, Out of Park Bonus, Restricted Stock Grants, Forgivable Producer Loans and Book Equity. As to Forgivable Producer Loans, page two of the memorandum said:

> This is a key component of the program … . We have over $21 million in available loan money. We made the first loans in December 2007 and the balance will be made available over the next few months. Each loan is forgivable over a 10-year period. Which cannot be shortened.[1] The size of the production book determines the eligibility for a producer loan. At $1 million, a producer is eligible for a $200,000 loan. At each increase of $500,00 in book size, the producer is eligible for an additional $100K loan. As an example, a producer with a $3.2 million book is eligible for a loan of up to

---

[1]  Despite the reference to the ten-year period not being shortened, it actually has been in several instances. Due to competitors offering shorter periods, and changes in tax laws, the period has been reduced to as little as four years.

$600K. When his book exceeds $3.5 million, he is eligible for an additional $100K loan.

7.  Two months later, on April 24, 2008, Mr. Dunbar sent a letter to Drew. The first

    paragraph stated:

> We appreciate and value your contribution to McGriff, Seibels & Williams, Inc. Accordingly, we have prepared this outline of traditional and retention compensation along with the attached exhibit to communicate and illustrate the various types and amounts of rewards, which the company makes available to you.

8.  The letter then falsely stated that McGriff's "retention compensation" was composed of

    only <u>four</u> cash compensation and stock grants and options: Earn Out Bonus, Out of Park

    Bonus, Restricted Stock and Book Equity. Remarkably, the letter made no mention of

    the Forgivable Producer Loans which are the subject of this lawsuit.

9.  Later in 2008, Drew became aware of the existence of the Forgivable Producer Loan

    Program (the "Program"). Drew only knew a Program existed but did not know how it

    operated. He called McGriff's CFO, Tom Lambert, and asked why he hadn't been

    included. Lambert falsely assured Drew that his participation "would come along later."

    It didn't, so Drew continued, over and over again, to inquire about his exclusion.

10. In 2009, at a conference at the Marriott hotel in Point Clear, Alabama, Drew pulled Bruce

    Dunbar aside and asked him why he hadn't received anything from the Program. Similar

    to Lambert, Dunbar provided a false front and told Drew he had a better deal because

    Drew was going to receive Book Equity for five years once he retired. But that was not

    true, as Book Equity was apparently provided to all producers, including several who

    were put in the Program.

11.     When another year or two passed and nothing happened, Drew talked with Tommy Ebner
        about being included in the Program.  When that went nowhere, Drew tried getting some
        relief from Doug Hodo.  Hodo was sympathetic and told Drew, "it wasn't right," because
        he should be in the Program.  He assured Drew he would do what he could about the
        situation.  But the half-dozen or so conversations Drew had with Hodo over the course of
        the next four to five years still didn't move the needle.  Mr. Hodo's response each time
        they spoke was that he simply couldn't get anything done.

12.     So, Drew reached out to Mr. Ebner again in 2012 and they met in the Dallas office.  Mr.
        Ebner said he would look into things.  Again, Drew heard nothing, so he called Mr. Ebner
        later that year but received no response to his phone message.  In 2015, Drew actually
        flew down to Houston to see Mr. Ebner about the Program.  Mr. Ebner told Drew that his
        participation in the Program was something he and Mr. Dunbar had actually talked about
        a lot but Drew's inclusion in Book Equity, rather than inclusion in the Program was what
        "we think is best for you.  But that, too, was false, because Book Equity participation and
        Program participation were clearly not mutually exclusive.

13.     During the time period of 2012-2015, Mr. Hodo asked Mr. Ebner to go directly to Mr.
        Dunbar (who actually made all the decisions of who was included in the Program) and
        ask why Drew had been excluded.  Ebner did so, and Dunbar's response was, "Drew and
        [former Plaintiff] Pete Barbara didn't get in because they were too old, and this was a
        retention program to keep the young producers."   Despite knowing of these comments
        by Dunbar and believing Drew was treated unfairly with respect to the Program, Mr. Hodo
        never reported them to Drew and Drew only learned of them during this litigation.  When
        asked why he didn't tell Drew or Barbara what Mr. Dunbar had said, Mr. Hodo responded,

4

"Not sure." When asked if he was fearful he would be retaliated against by Mr. Dunbar, Mr. Hodo responded, "Not sure."

14. Nevertheless, Mr. Drew's 2015 meeting with Mr. Ebner apparently did finally spur him into action. On December 18, 2015, Mr. Ebner sent an e-mail to CFO Tom Lambert with a subject line of "john Drew." The e-mail stated:

> John is following up on the meeting we (he and I) had in the summer about not getting a loan like the others, still in the game supporting company, having great years in new etc. You and I discussed about what we might be able to do as a one off and deferred discussion etc. John has followed up today and I just told him it was "on the list." Please put this on your Christmas/year end list as well. Thanks.

15. Five days later, Lambert responded by e-mail, apparently admitting Drew should have been made part of the program all along. The e-mail said:

> [w]e can give him some cash from the Great Performers bonus pool (say 25% to 50% of the amount of any loans he missed) in 2016 or we can give him a loan during the next cycle. Perhaps we can do for him what we did for Bob Verdin ... 50% of the qualifying loan amount to be forgiven over 5 years or 1/3 of the qualifying loan amount to be forgiven over 3 years.

16. On April 18, 2016, Lambert sent Drew an e-mail regarding his participation in the Program. It stated, "Congratulations on being selected to receive a producer retention loan! I have attached the loan document for your review and execution." The e-mail was accompanied by a Promissory Note in which Drew was provided a loan of only $50,000, which would be paid in five $10,000 annual installments through May 1, 2021, and was forgivable if he did not voluntarily terminate his employment or his employment was not terminated by McGriff for "Cause" during those five years.

17. Doug Hodo, who had been pushing for Drew's full participation in the Program, was disappointed by the meager payment of $50,000, particularly given Drew's production and all his contributions to McGriff. He contacted Drew and told him he was "embarrassed" the

Company paid him only $50,000.  Mr. Hodo added that he was "sorry," he had tried his best, $50,000 was all Drew was ever going to get out of the Program, and at least $50,000 was "better than nothing."  When asked in his deposition if he believed Drew was paid the $50,000 in 2016 in order to keep him quiet and not have to deal with him anymore, Hodo responded, "Not sure."

18. Faced with the certainty there was nothing else he could do, the die had been cast on his Program participation, and $50,000 was all he was ever going to get, Drew ceased any further efforts to be included in the Program.  From that point on, it wasn't until this litigation that McGriff provided him any visibility into whether any other Producers were receiving anything from the Program.

19. On September 14, 2021, former Plaintiff Peter and Barbara and Drew dual-filed their Charges of Discrimination with the Equal Employment Opportunity Commission and Texas Workforce Commission – Civil Rights Division.  In response to the Charges, McGriff submitted two Position Statements in or about September 2021.  The Statements were very telling.  Most notably, they did not deny Dunbar said he chose to exclude Barbara and Drew because they were "too old," and the Program was meant for retention of "the young guys." Respondent's Position Statement simply ignored the fact those statements were made. Moreover, the Position Statements provided a host of explanations for Barbara and Drew's exclusion that were completely at odds with explanations McGriff had previously submitted. For instance, Ulmer had told Barbara the Program was created to "attract employees to join our organization" and added that "[w]hen new compensation vehicles are put in place for new employees, we can't renegotiate employment compensation with existing hires."  Yet, in the Position Statements, McGriff turned that explanation on its head, instead stating:

4893-3999-6313.1

> McGriff's Producer Loan Program ("Program") was created in or about 2008.
> The Program was put in place to <u>retain</u> McGriff Producers with more than a
> [sic] one million dollars in their books of business.

20. Thus, according to McGriff in April 2021, the Program was a recruitment vehicle; however, as of September 2021, their story had become that it was a retention tool. McGriff has contradicted its reason on numerous occasions. Those reasons are all false and pretext for age discrimination.

21. McGriff contends, apparently based on Drew's initial Interrogatory Responses, that he is seeking damages only for being excluded from the Program in 2008. However, those responses were based on Drew's belief at that time that a person could receive only one Forgivable Producer Loan. However, since that time, he has learned -- as the record indisputably shows -- that McGriff provided many people multiple Forgivable Producer Loans. Particularly given the testimony of Doug Hodo that he knows of nothing that precluded Drew from being eligible to participate in the Program as recently as 2023, he now realizes his previous Interrogatory Responses were incorrect and has supplemented those responses.

22. McGriff's own corporate representative testified he did not know of anything that would have precluded Drew from participating in the Program in the same years as Marc Boots, who was a younger employee given a loan under the Program in 2008, 2009, 2014, 2016, 2018, 2019, 2020, 2021, and 2023. McGriff's corporate representative also testified he did not know of any reason why Drew was not included in the Program other than his age and agreed every time Drew was not made a part of the Program, other people younger than him were, which, of course, caused his compensation to be less than those younger participants. Thus, every

7

time McGriff paid these other similarly situated but younger employees pursuant to the Program, but not Drew, Drew's discrimination claim renewed.

23. The Promissory Note Drew signed in May 2016 for the loan he finally received indicated he would be paid in five $10,000.00 installments through May 1, 2021. These installments were approximately 1/10[th] of what he should have received, and other younger Producers did receive, pursuant to the Program formula.    Therefore, Drew was subjected to age discrimination through at least May 2021, which is well within 180 days of September 2021, when he filed his EEOC/TWC Charge of Discrimination.

24. Doug Hodo testified that the Program did not require an increase to the next threshold to receive another loan under the Program.  Mr. Hodo also testified he knows of nothing that would have precluded Drew from being eligible to participate in the Program in every year in which loans have been issued, including 2008, 2009, 2014, 2016, 2018, 2019, 2020, 2021 and 2023.    McGriff produced hundreds of Promissory Notes in discovery related to participation in the Program.  Of the 117 participants identified in the Promissory Notes, 80 received numerous loans under the Program.  And of the 37 who did not, eight only joined the Program in 2023, so they haven't yet had the opportunity to be granted multiple loans.

25. McGriff's corporate representative also testified he did not know of any reason why Drew was not included in the Program other than his age and agreed every time Drew was not made a part of the Program, other people younger than him were, which, of course, caused his compensation to be less than those younger participants.  Thus, every time McGriff paid these other similarly situated but younger employees pursuant to the Program, but not Drew, Drew's discrimination claim renewed.

26. Mr. Hodo went on to testify that (1) he and his supervisor Tommy Ebner – the CEO for McGriff Texas – both thought Drew should have been made part of the program, (2) he knows of no one better qualified than Drew to be in the program, (3) Drew is indisputably better qualified for inclusion based on his book of business than many others who are younger but have nevertheless been made part of the program, and (4) he knows of nothing that disqualifies Drew from participation.

27. To this day, Drew remains employed by McGriff as an Executive Vice President and Producer.

28. Drew is more than 40 years of age.

29. McGriff has more than 500 employees.

30. Drew was qualified to be included in the Program.

31. Drew suffered an adverse employment action by not being included in the Program.

32. McGriff employees who are outside the protected age class were treated more favorably than Drew by being included in the Program.

33. McGriff intentionally discriminated against Drew.

34. Drew's age was a motivating factor in, and/or but for cause of, McGriff's decision to exclude him from the Program.

35. McGriff's stated reasons for excluding Drew are false and pretext for age discrimination.

36. As a result of McGriff's intentional unlawful actions, it violated Chapter 21 of the Texas Labor Code and the Age Discrimination in Employment Act when it discriminated against Drew because of his age.

37. As a direct and proximate result of the conduct of McGriff, Drew has suffered injury.

38. For the injuries Drew has suffered, he seeks compensatory and consequential damages.

9

39. Because McGriff acted with malice or reckless indifference to Drew's state-protected rights, he is also entitled to punitive damages.

40. Because McGriff acted willfully because it "knew or showed reckless disregard' for whether the ADEA prohibited its conduct," Drew is also entitled to liquidated damages.

41. Drew seeks recovery of all applicable pre- and post-judgment interest.

42. Any propositions of law identified by Plaintiff that the Court concludes are more accurately considered propositions of law.

Respectfully submitted,

GRAY REED

By: _____

Jay Aldis
Texas State Bar No. 00785656
1300 Post Oak Blvd., Suite 2000
Houston, Texas 77056
Telephone: (713) 986-7175
Fax: (713) 986-7100
jaldis@grayreed.com

**ATTORNEYS FOR PLAINTIFF
JOHN DREW**

10

4893-3999-6313.1

## CERTIFICATE OF SERVICE

I hereby certify that on the ___29th___ day of December 2023, a copy of the foregoing document

was served on counsel of record by the Court's electronic filing system.

_____
Jay Aldis